Jack E. THOMPSON, Appellant–Respondent,

v.

Dana L. THOMPSON, Appellee–Petitioner.

No. 29A04–0307–CV–366.

Court of Appeals of Indiana.

July 15, 2004.

Deborah M. Agard, Indianapolis, IN, Attorney for Appellant.

Belle T. Choate, Choate & Haith, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

The marriage of Jack Thompson ("Jack") and Dana Thompson ("Dana") was dissolved in Hamilton Superior Court on May 1, 2003. Jack appeals the various orders issued pursuant to the proceedings associated with the dissolution and presents the following eleven restated issues for review:

I. Whether the trial court was within its discretion when it denied Jack's Trial Rule 60(B)(1) Motion for Relief from Judgment;

II. Whether the trial court issued orders pursuant to an improper use of its contempt power;

III. Whether the trial court was within its discretion when it denied Jack's Verified Motion for a Continuance;

IV. Whether the trial court's order for Jack to provide Dana with extended COBRA medical insurance coverage was an improper award of spousal maintenance;

V. Whether the trial court properly adjudicated Jack's $70,000.00 dissolution debt to be non-discharge-able for the purpose of federal bankruptcy proceedings;

VI. Whether the trial court's division of the Thompson marital estate was clearly erroneous;

VII. Whether the trial court improperly ordered Jack to pay his children's medical benefits;

VIII. Whether the trial court was within its discretion when it calculated Jack's child support obligations;

IX. Whether the trial court's order for Jack to provide for various aspects of his children's high school and college education was clearly erroneous;

X. Whether the trial court was within its discretion in awarding Dana trial attorney fees; and

XI. Whether this court may remand this case to the trial court so that the trial court may determine whether Dana is entitled to appellate attorney fees.

We affirm in part, reverse in part, and remand to the trial court for proceedings consistent with this opinion.

### Facts and Procedural History

Jack and Dana were married on October 22, 1983. Jack and Dana's daughter, M.T., was born to the marriage on August 25, 1985, and Jack and Dana's son, J.T., was born to the marriage on June 29, 1987.

Jack and Dana's combined salaries were able to provide the Thompson family with an extremely comfortable lifestyle supported by substantial income. Dana is a real estate broker with the Remax Corporation and, before the divorce proceedings, had enjoyed a gross income of roughly $150,000.00 per year. Jack is a regional vice-president of the Xerox Corporation

and has enjoyed gross income of well over $200,000.00 per year.

On January 11, 2001, Dana filed a petition to dissolve her marriage with Jack.[1] Dana also filed a simultaneous petition for a protective order, alleging that Jack had physically abused her and J.T. and had verbally abused her in front of both their children. Appellee's Supp. App. pp. 2–4. Pursuant to Indiana Code section 31–15–4–3,[2] the trial court granted Dana's petition. Appellant's Supp. App. p. 6.

On May 22, 2001, Dana filed a petition for rule to show cause, requesting the trial court to find Jack in contempt for violating its protective order. Appellant's App. pp. 190–91. On July 11, 2001, the trial court found Jack in contempt for violation of its no-contact order. However, because it found that Jack had only violated the order as a result of accepting his son's invitation to play basketball in his driveway, the trial court did not issue a punishment for Jack's contempt. Appellant's App. pp. 199–203.

The trial court also issued its preliminary order on July 11, 2001 and required Jack (1) to pay Dana $318.92 per week in child support, payable through the Clerk of Hamilton County, (2) to pay Dana $300.00 per month in spousal maintenance,[3] and (3) to pay Dana fourteen percent of all bonuses that he might receive during the pendency of the dissolution proceedings. Id. The trial court also granted Dana custody of M.T. and J.T. and provided Jack with visitation rights.

On January 16, 2002, Dana filed a motion for rule to show cause, alleging that Jack was in arrears for child support of $2494.00 and that Jack had failed to pay Dana the percentage of his bonuses required by the trial court. Appellant's App. p. 262. A hearing was held on this motion on March 8, 2003.

During this March 8th hearing, when Jack was asked about his failure to comply with the trial court's order, Jack initially asserted that he had received no bonuses during the relevant period. Appellant's App. p. 266. However, when pressed about the subject, Jack "suddenly remembered" that he had received a $10,250.00 and a $23,341.00 bonus, two $16,000.00 retention awards, and a $10,000.00 special employment award. Id.

On March 14, 2002, the trial court found Jack in contempt for (1) his failure to pay $2232.44 in child support, (2) paying portions of his child support directly to his children rather than through the Hamilton County Court Clerk, and (3) for not paying Dana a percentage of his October 2001 bonus. Appellant's App. pp. 265–69. The trial court ordered Jack to pay Dana $1250.00 in attorney fees and, after noting that it had already found Jack in contempt once, stated:

> Since Father's respect for this Court's orders is sadly lacking, the Court therefore orders the following punishment for his contempt in this case: Father shall be incarcerated at the Hamilton County Jail for a period of 60 days; 56 days of which are suspended and four days exe-

---

1. Dana had withdrawn $7000.00 from her and Jack's joint checking account shortly before this date. Tr. pp. 616–17. There was also $3000.00 in a safe located in Jack and Dana's home that was allegedly missing after the final separation date. Tr. p. 712. Dana opened a personal checking account in her name during February of 2001 and deposited $11,000.00 in this account. Tr. p. 618.

2. Ind.Code § 31–15–4–3 (1998).

3. The trial court vacated its award of spousal maintenance on August 10, 2001. Appellant's App. p. 211.

cuted to be served in the Hamilton County Intermittent Incarceration Program through Community Corrections. Father is ordered to appear [at the Hamilton County Jail] at 6:00 p.m. on Friday, March 22, 2002 and shall be released at 6:00 p.m. on Sunday, March 24, 2002. Father is to appear once again at 6:00 p.m. on Friday, April 26, 2002 and shall be released at 6:00 p.m. Sunday, April 28, 2002. In addition to the incarceration stated herein, Father is fined $5000.00. Said sum shall be paid to the Clerk of Hamilton County, Indiana, within 60 days of this order. If said sum is not paid within 60 days, Father shall immediately report to the Hamilton County Jail for the execution of all suspended time.

Appellant's App. p. 268.

On March 19, 2002, Jack filed a motion to reconsider jail sentence. Appellant's App. p. 270. The trial court denied this motion on the following day. Appellant's App. p. 274. After serving two days of his jail sentence, Jack filed an April 8, 2002 motion to correct error and an April 18, 2002 motion to suspend remaining contempt incarceration. Appellant's App. pp. 275–77. Both of these motions were denied. Despite the denial of his various motions, Jack refused to serve the remaining two days of his contempt sentence and failed to report to the Hamilton County Jail on April 26, 2002 as ordered. Appellant's App. p. 280.

On July 12, 2002, Dana filed a motion for rule to show cause and petition to modify child support, asserting that, due to Jack's refusal to exercise his allotment of parenting time, her circumstances had substantially changed since the court's issuance of its preliminary order and that Jack had failed to pay $2200.00 in court-ordered arrearages. Appellant's App. p. 282. On August 30, 2002, the trial court found Jack in contempt for not paying one week of child support but did not impose a sanction upon the finding.

On May 1, 2003, the trial court entered its final dissolution decree. The decree contained the following findings and orders of importance to this appeal:

(1) Dana is to have legal custody of M.T. and J.T. and shall have all decision-making rights over the children. Appellant's App. p. 24.

(2) Jack's allotted parenting time with J.T. shall be administered through the Family Access Center at Hamilton Centers as a result of Jack's dysfunctional behavior and supervision over J.T. Appellant's App. p. 24.

(3) Jack has a base salary of $164,000.00 per year plus several other forms of additional compensation. Dana has an annual net income of $66,000.00. Appellant's App. pp. 25–26.

(4) Jack is to pay $354.00 per week and eleven point five percent of any net compensation above his base salary for child support to Dana through the Hamilton County Clerk's Office. Appellant's App. p. 26.

(5) Dana is to pay twenty-nine percent and Jack is to pay seventy-one percent of the costs associated with a private secondary school or postsecondary education for M.T. and J.T. Appellant's App. p. 28.

(6) Jack is to provide M.T. with the 2001 Honda in his possession or with a suitable, comparable, and operable vehicle to be approved by Dana, and Jack shall be solely responsible for the vehicle's upkeep and insurance. Appellant's App. p. 31.

(7) Jack shall reimburse Dana $3240.00 and $6708.00 for various counseling services and uninsured medical costs she accrued in 2001 and 2002. Appellant's App. p. 31.

(8) Jack has failed to serve the period of incarceration in the Hamilton County Jail that he was previously ordered to serve, and he is now ordered to serve the remaining weekend of his sentence. Appellant's App. p. 32.[4]

(9) Jack is again found in contempt for his failure to comply with previous orders of the court and shall be sanctioned on a later date. Appellant's App. pp. 32–33.

(10) Because of Dana's responsibility to the family and household and Jack's lack of responsibility and behavior, Jack has caused Dana's income to be depleted over the years. Accordingly, Dana shall receive seventy percent of the marital estate and Jack shall receive thirty percent of the marital estate. Appellant's App. p. 35.[5]

(11) Jack is to pay Dana the sum of $70,000.00 within thirty days of the entry of this decree in order to provide Dana with seventy percent of the marital estate. This sum is considered maintenance, alimony, and property settlement and, accordingly, not dischargeable in federal bankruptcy proceedings. *Id.*

(12) There shall be a mutual restraining order for both parties to extend for twelve months after the issuance of this dissolution decree. Appellant's App. p. 36.

(13) Jack shall reimburse Dana $16,000.00 in attorney fees and shall pay Dana's attorney, Melvin Richards ("Richards"), $24,800.00 in attorney fees. Appellant's App. p. 37.

Final hearing for the above dissolution order was heard on April 16, 2002, October 15–16, 2002, and October 31, 2002. During this time, Jack was represented by Martha McDermott ("McDermott"). McDermott formally withdrew as Jack's counsel on March 28, 2003, and Elizabeth Van Tassel ("Van Tassel") filed her appearance on Jack's behalf on May 12, 2003. Appellant's App. pp. 367–68.

Dana filed her Motion to Correct Error, with regard to the final dissolution decree, on May 30, 2003, and Jack filed his Motion to Correct Error on June 2, 2003. Appellant's App. pp. 382, 402. Dana's Motion to Correct Error primarily concerned her contention that the trial court had overvalued her salary and undervalued Jack's salary for the purpose of determining child support. Appellant's App. pp. 382–86. Jack's Motion to Correct Error challenged the trial court's unequal division of the marital estate, contempt order, requirement that his time spent with J.T. must be supervised by the Hamilton County Family Access Center, and noted that because M.T. had been involved in two automobile accidents since Dana's filing for dissolution, the cost of keeping M.T. in the 2001 Honda was prohibitively expensive. Appellant's App. pp. 402–20. The trial court set these two motions for hearing on June 23, 2003. Appellant's App. p. 15.

On June 3, 2003, Van Tassel moved to withdraw as Jack's attorney due to a con-

---

4. The trial court temporarily stayed the execution of this sentence on May 15, 2003 on the basis that Jack was scheduled to have surgery that would interfere with his jail sentence.

5. The trial court also based this order on the disparity between Jack and Dana's income and Jack's age and future earning ability as compared to Dana. Appellant's App. p. 35.

flict of interest and sent Jack a letter officially notifying him of her decision to withdraw. Appellant's App. p. 432. This letter reminded Jack of a June 9, 2003 hearing but did not inform him of the June 23, 2003 hearing on the motions to correct error. Appellant's App. p. 517. On June 6, 2003, Jack obtained representation from Kevin McGoff ("McGoff") and Darlene Seymour ("Seymour").

On June 11, 2003, Dana filed a verified petition for contempt citation and request for emergency hearing. Dana's petition alleged that Jack failed to pay the money judgments ordered in the trial court's May 1, 2003 dissolution decree, failed to provide M.T. with the 2001 Honda, and failed to abide by various other court orders. Appellant's App. p. 438. On June 13, 2003, the trial court ordered Jack to appear before the court on July 2, 2003 in order to answer to the various claims of contempt contained in Dana's petition.

After realizing that they too had a conflict of interest, McGoff and Seymour moved to withdraw their appearance on Jack's behalf on June 20, 2003.[6] Appellant's App. p. 481. Jack received McGoff and Seymour's letter officially informing him of their decision to withdraw on June 21, 2003. Appellant's App. p. 521. This letter reminded Jack of his July 2, 2003 hearing to answer to Dana's contempt allegations but did not inform him of his June 23, 2003 hearing on the motions to correct error. Appellant's App. pp. 481, 521.

Neither Jack nor any attorney on his behalf attended the June 23, 2003 hearing on the motions to correct error. The trial court nonetheless proceeded with the hearing and, in so doing, noted:

> [T]he Court notes that the Respondent Jack E. Thompson has been duly notified of this proceeding. Our records currently show the appearances of a Darlene Seymour and Kevin McGoff; however, the Court is informed that they are in the process of withdrawing their appearance, although the Court has not formally received those documents. But those counsel are aware of the proceedings here today and neither Jack Thompson, Mr. McGoff, nor Ms. Seymour is in appearance.

Appellant's App. p. 74.

The trial court also issued a June 23, 2003 contempt finding on the basis that Jack had failed to pay attorney's fees in the amount of $24,800.00 to Richards. Appellant's App. pp. 484–87. The trial court reduced the above amount to a judgment in favor of Richards. *Id.* The trial court also found that, due to Jack's failure to comply with the court's previous orders, Dana had incurred an additional $11,205.82 in attorney fees since final hearing and held Jack liable for the entirety of that amount. *Id.*

On July 2, 2003, the trial court conducted a contempt hearing pursuant to Dana's June 11, 2003 Petition for Contempt Citation. Jack attended this hearing but filed a *pro se* motion for continuance on the basis of his inability to secure representation.[7] Appellant's App. pp. 57–59. The trial court denied Jack's motion, noting that Dana alleged that she was unable to

---

6. The trial court did not grant McGoff and Seymour's Motion for Leave to Withdraw until June 24, 2003, the day after the June 23, 2003 hearing on the motions to correct error. Appellant's App. p. 491.

7. In filing this petition, Jack noted that he had contacted fifteen lawyers in an attempt to

secure representation; however, all of them had been conflicted out of such representation as a result of Dana's consultation with them or a member of their firm. Appellant's App. p. 519. Both Jack and Dana have hired and dismissed several attorneys during the course of these proceedings.

support herself as a result of Jack's alleged failures to comply with the court's orders and that a continuance might place Dana in "dire straits." Tr. p. 984. However, the trial court also stated that it would hold over any determination on sanctions until a later hearing. Tr. p. 984; Appellant's App. p. 59.

Based upon the evidence adduced at this hearing, the trial court issued a contempt order on July 11, 2003. In this order, the trial court found Jack in contempt for (1) failure to surrender the 2001 Honda to M.T., (2) failure to pay Dana $3240.00 and $6708.00 for various medical and counseling expenses, (3) failure to pay the children's various school expenses ordered in the dissolution decree, and (4) failure to turn over various accounts ordered by the decree. The trial court then set the matter for a one-hour hearing on August 22, 2003 to address the remaining issue of coercive measures and instructed Jack to secure representation by this date. Appellant's App. pp. 57–60.

The trial court issued its order on Jack and Dana's Motions to Correct Error on July 14, 2003. This order noted that (1) Jack and his attorneys failed to appear at the June 23, 2003 hearing held on the motions, (2) Jack failed to exercise eighty-one days of parenting time in 2002 and fifty-four days of parenting time in the first six months of 2003 and this failure reduced Dana's ability to earn a living as a realtor, (3) Jack failed to comply with the decree's college expense orders, and (4) there was evidence in the record of domestic violence on the part of Jack. Appellant's App. p. 64.

Based upon these findings, the trial court:

(1) Held that Dana shall enjoy primary custody of M.T. and J.T. Appellant's App. p. 61.

(2) Recalculated Jack and Dana's incomes, lowering Dana's annual net income calculation from $66,000.00 per year to $39,589.00 and raising Jack's annual net income calculation from $164,000.00 per year to $198,655.55, plus irregular income from bonuses and other sources. *Id.*

(3) Adjusted the percentage of parental responsibility from a seventy-one/twenty-nine-percent split favoring Dana to an eighty-three/seventeen-percent split favoring Dana. Appellant's App. p. 63.

(4) Required Jack to set up an expense account for M.T.'s college fund. Appellant's App. pp. 63–64.

(5) Raised Jack's child support payments from $354.00 per week to $428.18 per week. Appellant's App. p. 65.

(6) Ordered Jack to provide Dana with COBRA medical insurance coverage until June 1, 2004. Appellant's App. p. 68.

(7) Ordered Jack to pay $2940.00 in legal fees accrued by Dana. Appellant's App. p. 69.

(8) Reiterated its order that Jack serve his remaining weekend in the Hamilton County Jail. Appellant's App. p. 69.[8]

On July 22, 2003, Jack filed an Indiana Trial Rule 60(B)(1) motion for relief from judgment, alleging that he did not have adequate notice of the June 23, 2003 hearing on the motions to correct error or adequate representation during the July 2, 2003 contempt hearing. Appellant's App.

---

8. On July 30, 2003, the trial court stayed the execution of Jack's jail sentence pending this appeal. Appellant's App. p. 18.

p. 506. The trial court denied Jack's motion on July 25, 2003. Appellant's App. p. 522.

Jack filed his notice of appeal on August 8, 2003, and this court accepted jurisdiction over the proceedings. However, this court remanded the proceedings back to the trial court on August 25, 2003 to determine whether Dana had violated the stay order issued pursuant to this appeal. Appellant's App. p. 19. On November 26, 2003, the trial court determined that Dana violated the stay order by absconding with marital property, ordered her to return the property at issue, and ordered her to pay Jack's attorney fees. This court has since reacquired jurisdiction. Additional facts will be provided as necessary.

Before we commence our consideration of the issues, we note that both Jack and Dana complain about the argumentative and spiteful tone of the other's brief and constantly allege and argue waiver concerning most of the issues presented. The most apt observation in this regard is that each is throwing stones from a glass house. Both briefs reflect poorly on Jack and Dana and their respective attorneys. Neither Jack nor Dana consistently responds to the other's arguments nor fully develops his/her own arguments. We will therefore ignore stylistic complaints and will discuss waiver arguments only when absolutely necessary. To do otherwise would require the trial court to completely retry the case, an unreasonable sanction for a hardworking court and judge.

### I. Indiana Trial Rule 60(B)(1)

Trial Rule 60(B)(1) states, "[o]n motion and upon such terms as are just, the court may relieve [a party] from entry of default, final order, or final judgment ... for the following reasons: mistake, surprise, or excusable neglect." Ind. Trial Rule 60(B)(1).

■ We review the denial of a Trial Rule 60(B) motion for an abuse of discretion. *Rice v. Comm'r Ind. Dept. of Env't Mgmt.*, 782 N.E.2d 1000, 1003 (Ind.Ct.App. 2003). An abuse of discretion occurs if the trial court's decision is clearly against the logic and the effect of the facts and circumstances before the court or if the court has misinterpreted the law. *State v. Willits*, 773 N.E.2d 808, 811 (Ind.2002).

■ Jack contends that the trial court abused its discretion when it refused to vacate its July 11, 2003 Entry of Contempt and its July 14, 2003 Order on Motions to Correct Error. In order to prevail on this issue, Jack must establish (1) excusable neglect and (2) a meritorious basis to set aside the judgment—also referred to as prejudice. *See Fitzgerald v. Cummings*, 792 N.E.2d 611, 614–15 (Ind.Ct.App.2003); *see also In re Marriage of Minnick v. Minnick*, 663 N.E.2d 1226, 1228 (Ind.Ct. App.1996).

#### A. *Excusable Neglect*

■ Because the facts and circumstances of each case differ, there are no fixed rules or standards for determining what constitutes excusable neglect pursuant to Trial Rule 60(B)(1). *Fitzgerald*, 792 N.E.2d at 614–15 (Ind.Ct.App.2003); *see also In re the Marriage of Holley*, 659 N.E.2d 581, 584 (Ind.Ct.App.1995). In making such decisions, the trial court must balance the need for an efficient judicial system against the judicial preference for resolving disputes on their merits. *Id.* The burden is on the movant to establish relief under Trial Rule 60(B). *Graham v. Schreifer*, 467 N.E.2d 800, 802 (Ind.Ct. App.1984).

■ Although there are exceptions, generally, the negligence of an attorney is attributable to the client for Trial Rule 60(B) purposes, and attorney negligence will not support a finding of excusable

neglect. *Morequity Inc. v. Keybank,* 773 N.E.2d 308, 314 (Ind.Ct.App.2002), *trans. denied* (citing *Moe v. Koe,* 165 Ind.App. 98, 104–05, 330 N.E.2d 761, 765 (1975), *trans. denied* ); *see also In re the Marriage of Ford,* 470 N.E.2d 357, 361 (Ind.Ct.App. 1984) ("We believe the only equitable result as between wife and the husband is for [wife] to suffer the consequences of any errors of judgment made by the attorney she hired."); *Vanjani v. Fed. Land Bank of Louisville,* 451 N.E.2d 667, 671 (Ind.Ct. App.1983) (noting that numerous cases hold that the negligence of an attorney does not amount to excusable neglect as a matter of law); *but see Rose v. Rose,* 181 Ind.App. 98, 100–01, 390 N.E.2d 1056, 1058 (1979) (the general rule with regard to the negligence of the attorney being attributable to the client is tempered by Trial Rule 60(B)'s rule that the facts and circumstances of the particular case are controlling).[9]

■ Jack claims that, under the facts and circumstances of this case, this court should depart from the general rule concerning attorney negligence because an attorney malpractice action will do nothing to remedy his loss of liberty, unequal property distribution, child support order, or college expense order. Br. of Appellant at 13. We reject Jack's invitation to depart from the general rule concerning claims of malpractice and excusable neglect. If his reasoning were based upon child visitation or child custody orders, we might be inclined to agree with his characterization of malpractice as an inadequate remedy. However, the trial court's child support, college expense, and property division orders are easily quantifiable for purposes of a remedy.

For these reasons, Jack has failed to establish the mandatory element of excusable neglect and is not entitled to Trial Rule 60(B) relief.

### B. *The Hearing Requirement*

■ Jack also contends that the trial court erred when it denied his Trial Rule 60(B) motion without affording him a hearing. Trial Rule 60(D) generally requires trial courts to hold a hearing on any pertinent evidence before granting Trial Rule 60(B) relief.[10] *Integrated Home Techs. v. Draper,* 724 N.E.2d 641, 643 (Ind.Ct.App. 2000) (citing *Cornelius v. State,* 575 N.E.2d 20, 21 (Ind.Ct.App.1991), *trans. denied* ). However, when there is no pertinent evidence to be heard, a hearing is unnecessary. *Pub. Serv. Comm'n v. Schaller,* 157 Ind.App. 125, 133–34, 299 N.E.2d 625, 630 (1973).

A hearing might have been highly useful in establishing the prejudice element of Jack's Trial Rule 60(B)(1) claim. However, because Jack has failed to establish excusable neglect, consideration of the issue of Trial Rule 60(D) presentation of evidence at a hearing is unnecessary.[11]

---

9. We express no opinion as to whether the actions of Van Tassel, McGoff, or Seymour amounted to attorney negligence or malpractice.

10. Trial Rule 60(D) specifically states, "In passing upon a motion allowed by subdivision (B) of this rule the court shall hear any pertinent evidence." Ind. Trial Rule 60(D). Although Jack requested a hearing on his Motion to Correct Error, he failed to request a Trial Rule 60(B) hearing. Appellant's App. p. 515.

11. Jack does not allege his attorneys' failure to attend the June 23, 2003 hearing or inform him of the hearing was excusable. Jack merely alleges that the failure of his attorneys should not be attributable to him. *See* Br. of Appellant at 13 ("The negligence of Jack's post-trial attorneys by failing to inform him of the motion to correct error hearing and failing to appear on his behalf should not be imputed to him under the circumstances of this case."). Had Jack asserted that the actions of his attorneys were excusable, the

## II. Contempt

■ When reviewing a finding of contempt, we accept as true the statement entered by the trial court and will interfere with the trial court's judgment only where it clearly appears that the acts in question are not contemptuous. *In re Nasser*, 644 N.E.2d 93, 95 (Ind.1994) (citing *In re Caito*, 459 N.E.2d 1179 (Ind. 1984)).

### A. *Jack's Jail Sentence*

Jack challenges the trial court's imposition of his jail sentence on the basis that (1) the trial court's contempt order was entirely punitive and did not give him an opportunity to purge himself of the contempt, (2) he was denied the opportunity to defend against the proceedings, and (3) the trial court, in contravention of Indiana Code section 34–47–3–5,[12] failed to issue a rule to show cause that clearly and distinctly set forth the facts alleged to constitute Jack's contempt. However, Jack's contentions are misplaced; they address the wrong contempt order.

Jack begins his argument by stating, "[t]he trial court's *July 14, 2003* order that requires Jack to spend two days in jail is purely punitive in nature, and it was issued as a result of his alleged failure *to comply with the final judgments issued in the decree*." Br. of Appellant at 15 (emphasis added). The requirement that Jack serve his remaining two-day jail sentence did not arise from the June 23, 2003 hearing on the motions to correct error or from the trial court's July 14, 2003 order issued pursuant to this hearing. *See* Appellant's App. p. 69 (the trial court noting in its July 14, 2003 order, "by reason of this court's *prior* finding of contempt" Jack is required to serve two days in the Hamilton County Jail.) (emphasis added). Rather, Jack's prior finding of contempt and corresponding jail sentence referred to by the trial court arose from the March 8, 2002 hearing and the trial court's long-since-issued March 14, 2002 order. Appellant's App. p. 268. Jack had served two days of the four-day sentence issued on March 14, 2002, and the trial court's July 14, 2003 statement was merely instructing Jack to comply with its prior order rather than issuing Jack an additional two-day jail sentence.[13]

Jack argues that he may not challenge the jail sentence arising out of the trial court's March 14, 2002 order of contempt because the order was not timely appealed and his failure to do so could serve to waive this issue for the purposes of the appeal at bar. Br. of Appellant at 16 n. 1. However, because Jack's jail sentence issued pursuant to the March 14, 2003 contempt order is illegal and raises fundamental issues of due process fairness, we address the issue *sua sponte*.

#### 1. *The Legality of Jack's Jail Sentence*

■■ The primary objective of a civil contempt proceeding is not to punish the contemnor but to coerce action for the benefit of the aggrieved party. *Emery v. Sautter*, 788 N.E.2d 856, 860 (Ind.Ct.App. 2003), *trans. denied* (citing *Duemling v. Ft. Wayne Cmty. Concerts, Inc.*, 243 Ind. 521, 524–25, 188 N.E.2d 274, 276 (1963)).

---

presentation of evidence at a hearing may have been useful in establishing excusable neglect.

12. Ind.Code § 34–47–3–5 (1999).

13. Jack's jail sentence also did not arise from the trial court's July 11, 2003 order of contempt for which Jack did not receive representation. *See* Appellant's App. pp. 57, 59 (trial court noting that any determinations regarding punishment or coercive measures arising from the July 11, 2003 order would be resolved in an August 22, 2003 hearing).

While any imprisonment, of course, has punitive and deterrent effects, such imprisonment shall be viewed as remedial rather than punitive if the court conditions the contemnor's release upon the contemnor's willingness to comply with the order from which the contempt finding was based upon. *Moore v. Ferguson*, 680 N.E.2d 862, 865 (Ind.Ct.App.1997), *trans. denied.*

When the trial court ordered Jack to serve two weekends in the Hamilton County Jail pursuant to its March 14, 2002 contempt finding, it failed to indicate that Jack could purge himself of the punishment and forgo his jail sentence by complying with its orders. Appellant's App. p. 268. Rather, the trial court expressly stated, "[t]he court therefore orders the following *punishment* for [Jack's] contempt." *Id.* (emphasis added).

There are, of course, instances in which a court may issue a punitive contempt order without a provision allowing the contemnor to purge him or herself of the contempt, such as is found in "indirect criminal contempt." However, the contempt order in the case at bar may not be characterized as an order of indirect criminal contempt. *See Allison v. State*, 243 Ind. 489, 494, 187 N.E.2d 565, 568 (Ind. 1963) (indirect criminal contempt must be filed as an independent cause of action and prosecuted by the State); *T. v. State*, 439 N.E.2d 655, 659 (Ind.Ct.App.1982) (a criminal contempt proceeding is a separate action from the main action out of which it arises).

Because the contemptible conduct was of the nature of indirect civil contempt and the trial court did not condition Jack's jail sentence upon his compliance with its orders, Jack's jail sentence arising from trial court's contempt order was illegal, and we now vacate that order.

2. *Fundamental Error*

An illegal sentence may be attacked collaterally or directly "at any time." *Hull v. State*, 799 N.E.2d 1178, 1181 (Ind.Ct.App.2003) (citing *Beanblossom v. State*, 637 N.E.2d 1345, 1349 (Ind. Ct.App.1994), *trans. denied*). Not only may an illegal sentence be challenged at any time, but this court is "duty bound" to correct an illegal sentence. *Id.* (citing *Golden v. State*, 553 N.E.2d 1219, 1223–24 (Ind.Ct.App.1990), *trans. denied*).

We acknowledge that the above-cited cases concern criminal sentences rather than sentences issued as the result of a civil contempt finding. However, the underlying reasoning of these cases is that a court should not sit idly by and allow a person to be imprisoned by an illegal order. We therefore proceed to consider the legality of Jack's contempt sentence.

B. *Other Contempt Orders*

Because parties may enforce obligations to pay a fixed sum of money through execution of judgment as provided by Trial Rule 69, contempt is generally unavailable to enforce an obligation to pay money. *Cowart v. White*, 711 N.E.2d 523, 531 (Ind.1999) (citing *Pettit v. Pettit*, 626 N.E.2d 444, 447 (Ind.1993)); *see also Marsh v. Marsh*, 162 Ind. 210, 212, 70 N.E.2d 154, 155 (1904) (the fact that a judgment may be enforced by execution creates a strong implication against the more drastic remedy of contempt).

Jack asserts that the orders contained in paragraphs twenty-four, twenty-five, twenty-eight, thirty-one, thirty-two, and thirty-three of the trial court's July 14, 2003 order constituted impermissible contempt penalties. We disagree.

The trial court's July 14, 2003 order is not a contempt order but, rather, an order issued pursuant to Jack and Dana's Mo-

tions to Correct Error. The title of this order clearly states, "Order on Motions to Correct Error," and the word "contempt" is not contained in the paragraphs complained of by Jack. Appellant's App. pp. 66–69.[14] We also disagree with Jack's characterization of these orders as "penalties." The clear effect of the orders contained in the paragraphs at issue is not to punish or coerce Jack but merely the result of the trial court's difficult work of equitably dividing Jack's and Dana's marital property. Appellant's App. pp. 61–69. Thus, Jack's challenge to these orders as an improper use of the trial court's contempt power fails.

■■■ Jack next challenges the trial court's July 11, 2003 contempt order issued as a result of his failure to provide M.T. with the 2001 Honda in his possession or a like vehicle acceptable to Dana. However, Jack raises this issue for the first time in his reply brief. Although a trial court is usually required to enforce an obligation that a party pay a fixed sum of money through Trial Rule 69 execution of judgment, the law is clear that it may use its contempt power to enforce a decree requiring a party to transfer property to another. *Cowart*, 711 N.E.2d at 531 (citing *State ex rel Dale v.Super. Ct. of Boone County*, 260 Ind. 661, 299 N.E.2d 611 (1973)). For all of these reasons, Jack's claim fails.

Jack also challenges the trial court's July 11, 2003 contempt order on the basis that he complied with the trial court's order when he attempted to deliver "a vehi-

cle" to M.T. Reply Br. of Appellant at 8. The trial court's May 1, 2003 dissolution decree stated:

> [Jack] has removed the Honda vehicle from the use of [M.T.], and he shall immediately provide [M.T.] with a suitable, comparable, and operable vehicle (either *the Honda or a newer vehicle or vehicle of like age which must be acceptable to [Dana]* ).

Appellant's App. p. 31 (emphasis added). Assuming the validity of this order for the purposes of considering the issues of contempt, Jack's argument fails because "a vehicle" does not satisfy the above-cited order. Because Jack fails to assert that the vehicle he offered to M.T. was a "newer vehicle or a vehicle of like age acceptable to Dana," his argument fails.

For all of these reasons, Jack has failed to meet his burden of establishing that the trial court's orders unrelated to his jail sentence were an improper use of its contempt power.[15]

### III. Motion for Continuance

■■■ Jack claims the trial court improperly denied his July 2, 2003 *pro se* Motion for Continuance on the hearing held pursuant to Dana's June 11, 2003 Motion for Rule to Show Cause. The decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court. *Riggin v. Rea Riggin & Sons, Inc.*, 738 N.E.2d 292, 311 (Ind.Ct. App.2000). An abuse of discretion may be found in the denial of a motion for continuance when the moving party has shown

---

**14.** The trial court did enter a contempt order against Jack on June 23, 2003 concerning $24,800.00 in attorney fees. However, the trial court properly reduced this order to a judgment rather than punishing Jack for the contempt.

**15.** We note that some of the trial court's July 11, 2003 contempt findings concern a fixed

monetary obligation. However, the monetary obligations contained in this contempt order are nothing more than the trial court's reiteration of prior orders that Jack already had an obligation to comply with. For this reason and because Jack does not specifically challenge these orders on appeal, we decline to address them.

good cause for granting the motion. *Id.* However, no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial, and the withdrawal of an attorney does not automatically entitle a party to a continuance. *Id.* (citing *Danner v. Danner*, 573 N.E.2d 934, 937 (Ind.Ct.App. 1991)).

A careful review of the record indicates that the trial court was placed in an extraordinarily difficult position by the events surrounding this issue. On the one hand, it appears as though Jack not only exercised due diligence in attempting to secure representation for the hearing but that his difficulties in securing representation were the direct result of Dana's frequent hiring and firing individual attorneys within the local divorce bar—thus, conflicting Jack out of an opportunity to obtain representation. On the other hand, the trial court accurately observed:

> [the problem is that your wife alleges that she] currently is unable to support herself due to the alleged failure to comply with this Court's prior orders and there was a request for an emergency hearing which puts the court in a difficult position that we have an allegation that someone is in dire straits.

Appellant's App. p. 127. Given the two competing interests, the trial court's decision to confine the hearing to the finding of contempt but to hold over any sanctions until a later hearing where Jack would have the opportunity to be represented by counsel was the best alternative that could have been reached under the difficult circumstances.

Jack's contention that his required attendance at a future hearing constitutes

prejudice is without merit. Other than the requirement that Jack attend a future hearing, there does not appear to be anything in the trial court's July 11, 2003 order that requires Jack to do something that he was not already required to do by a previous order. If Jack complies with the orders of the court, the issue of sanctions becomes moot, and as stated in the last section of this opinion, the trial court may not issue an indirect civil contempt order strictly for the purpose of punishment.

Under these facts and circumstances, the trial court was within its discretion when it denied Jack's Motion for Continuance.

## IV. Spousal Maintenance[16]

▮ Jack next claims the trial court's order requiring him to pay Dana's COBRA medical coverage constitutes an impermissible award of spousal maintenance. Dana neither argues that the trial court's order did not constitute an award of spousal maintenance nor that the order was a proper award of spousal maintenance. Accordingly, a less-stringent standard of review applies, and we may reverse the trial court's order if Jack establishes prima facie error. *See Rodziewicz v. Waffco Heavy Duty Towing*, 763 N.E.2d 491, 493 (Ind.App.2002). Prima facie error is error "at first sight, on first appearance, or on the face of it." *State v. Necessary*, 800 N.E.2d 667, 668 (Ind.Ct.App.2003). The entirety of Dana's appellee's argument consists of the statement "Dana disagrees" with Jack's position, a recitation of the trial court's order, and an unsupported statement asserting that the trial court acted

---

**16.** In his Reply Brief, Jack asserts that Dana fails to respond to his arguments contained in this section of his Appellant's Brief. Reply Br. of Appellant at 8–9. We agree. *See* Br. of Appellee at 15–17.

within its discretion.[17]

Indiana courts are very restricted in their ability to award spousal maintenance. *Brinkmann v. Brinkmann*, 772 N.E.2d 441, 445–46 (Ind.Ct.App.2002) (citing *Voigt v. Voigt*, 670 N.E.2d 1271, 1275–77 (Ind. 1996) (Spousal maintenance may only be ordered when the court finds (1) a spouse to be physically or mentally incapacitated, (2) a spouse must forego employment in order to care for a child with a physical or mental incapacity, or (3) a spouse needs support while acquiring sufficient education or training to get an appropriate job.)). However, periodic payments made by a party after a dissolution decree are not necessarily spousal maintenance and are considered to be in the nature of a property settlement under certain circumstances. *Brinkmann*, 772 N.E.2d at 446 (citing *In re Marriage of Buntin*, 496 N.E.2d 1351, 1354 (Ind.Ct.App.1986)).

■■ Factors that tend to indicate that a periodic post-dissolution payment constitutes an award of spousal maintenance include:

(1) The designation of a payment as spousal maintenance;

(2) The presence of provisions terminating the payments upon the death of either party;

(3) The presence of orders requiring payments made from future income;

(4) The presence of a provision for termination upon marriage;

(5) The presence of provisions calling for modification based upon future events; and

(6) The presence of orders requiring payments for an indefinite period of time.

*Id.*

■■ Periodic post-dissolution payments are more in the nature of a property settlement if a combination of the following factors are present:

(1) The payments are for a sum certain payable over a definite period of time;

(2) There are no provisions for modification based upon future events;

(3) The obligation to make the payment survives the death of the parties;

(4) The provisions call for interest; and

(5) The award does not exceed the value of the marital assets at the time of dissolution.

*Id.*

The need for Dana's health insurance coverage terminates in the event of her death, and as Jack notes, the COBRA medical benefit payments will obviously be made from his post-dissolution income. Br. of Appellant at 20 (citing *In re Marriage of Coomer*, 622 N.E.2d 1315, 1320 (Ind.Ct.App.1993) (noting that a COBRA medical benefit paid out of the husband's future income resembled an award of spousal maintenance)). Pursuant to the prima-facie-error standard, Jack's argument and citation to authority characterizing COBRA medical benefits as spousal maintenance is sufficient to establish that the trial court's order constituted an award of spousal maintenance.

17. Jack also asserts that the trial court had no jurisdiction to issue the award of COBRA benefits because the order was issued two months after the trial court's issuance of the final dissolution decree. However, this order was issued pursuant to Dana's Motion to Correct Error, and Dana's Motion to Correct Error was filed within the thirty-day limit of Trial Rule 59(C). Appellant's App. p. 382. The trial court's June 2, 2003 order setting this matter for hearing on June 23, 2003 was well within Trial Rule 53.3(A)'s forty-five-day limitation. Appellant's App. p. 15.

The record does not support a finding that Dana has a mental or physical condition that interferes with her income-earning ability. *See* Appellant's App. p. 30 ("[Dana] presented no medical testimony to substantiate her arthritic condition. Nor has she shown that a medical condition has materially affected her ability to support herself."). The substantial salaries that Dana was able to earn as a realtor indicate that she needs no additional education or training. Finally, there is no evidence in the record disclosing a severe mental or physical condition on the part of M.T. or J.T. that would require Dana to forego her employment. Accordingly, we vacate Dana's award of COBRA benefits as an improper award of spousal maintenance.

## V. Bankruptcy

The trial court's May 1, 2003 dissolution decree ordered Jack to pay Dana $70,000.00 in order to provide Dana with seventy percent of the marital estate. Appellant's App. p. 35. In issuing this order, the trial court held:

> [s]aid payment is considered a part of maintenance, alimony, and property settlement pursuant to §§ 523(5) and 523(15)(A) of the U.S. Bankruptcy Code, of which the Court takes judicial notice, and is not dischargeable in bankruptcy.

*Id.* Jack asserts that, because the trial court did not find Dana mentally or physically incapacitated and there was no evidence presented indicating that this equalizing judgment was issued to provide for Dana's daily needs, the $70,000.00 payment is dischargeable in bankruptcy.

The United States Bankruptcy Code states in part:

(a) A discharge under sections 727, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree, or other order of a court of record, determination made in accordance with state or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

(B) such debt includes a liability designated as alimony, maintenance, or support unless such liability is actually in the nature of alimony maintenance, or support.

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree, or other order of a court of record, a determination made in accordance with state or territorial law by a government unit unless—

(A) The debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependant of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523 (2004).

 A bankruptcy discharge voids trial court judgments based upon the personal liability of the debtor. *Frazier v. Frazier,* 737 N.E.2d 1220, 1223 (Ind.Ct.

App.2000) (citing *Cowart v. White,* 711 N.E.2d 523, 528 (Ind.1999)). However, the above-listed section of the Bankruptcy Code "explicitly excepts obligations for any debt to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child in connection with a separation agreement, divorce decree, or other order of a court of record." *Id.* State courts have concurrent jurisdiction with federal courts to determine what constitutes non-dischargeable maintenance or support obligations. *Goodman v. Goodman,* 754 N.E.2d 595, 602 (Ind.Ct.App.2001).

### A. 11 U.S.C. section 523(a)(5)

The trial court based its first rationale for its order indicating that Jack's $70,000.00 payment is not dischargeable upon 11 U.S.C. section 523(a)(5) and its corresponding conclusion that the $70,000.00 payment is considered maintenance, alimony, and property settlement. Appellant's App. p. 35.

#### 1. Property Settlement

 The trial court's designation of the $70,000.00 payment as a "property settlement" does not bring its order within 11 U.S.C. section 523(a)(5)'s exception to discharge provision. 11 U.S.C. section 523(a)(5)'s exceptions to discharge include (1) "alimony to," (2) "maintenance of," and (3) "support of a former spouse or child." 11 U.S.C. § 523(a)(5). Although the term "property settlement" is included in 11 U.S.C. section 523(a)(5), it is only included as a condition precedent capable of trig-

gering the three listed exceptions to discharge; it is not a fourth and independent exception to discharge.[18] 11 U.S.C. § 523(a)(5).

#### 2. Maintenance

Indiana law also does not allow the $70,000.00 payment to be characterized as spousal maintenance. As discussed in the previous section of this opinion, there are three limited instances in which a trial court may make an award of spousal maintenance, and Dana has not established her right to receive maintenance under any of these provisions. *See Frazier,* 737 N.E.2d at 1224; Appellant's App. p. 30.[19]

### B. 11 U.S.C. section 523(a)(15)

 The trial court also based its conclusion that the $70,000.00 payment was not dischargeable upon 11 U.S.C. section 523(a)(15) and its corresponding conclusion that the payment constituted maintenance, alimony, and property settlement. Appellant's App. p. 35. As stated in our analysis under 11 U.S.C. section 523(a)(5), the record does not support an award of spousal maintenance, and Indiana does not recognize alimony. However, because 11 U.S.C. section 523(a)(15)'s exception to discharge contemplates debts arising from a dissolution decree that are not included within the three exceptions listed by 11 U.S.C. section 523(a)(5), the trial court's property distribution order may *eventually* be subject to the provisions of 11 U.S.C. section 523(a)(15).

Nonetheless, under the facts and circumstances before us, 11 U.S.C. section

---

18. This interpretation can be derived from both the language of 11 U.S.C. section 523(a)(5) and by the fact that 11 U.S.C. section 523(a)(5)(B) makes reference to alimony, maintenance, and support but does not reference "property settlement." 11 U.S.C. § 523(a)(5)(B).

19. The trial court's alimony reference is also of no avail in establishing an exception to bankruptcy discharge because Indiana does not recognize alimony. *Brinkmann v. Brinkmann,* 772 N.E.2d 441, 444–45 (Ind.Ct.App. 2002).

523(a)(15) is no avail to Dana. 11 U.S.C. section 523(a)(15) is only triggered when the creditor-spouse files a petition *during bankruptcy* seeking to have the debt in question declared non-dischargeable. 11 U.S.C. §§ 523(a)(15)(A), (a)(15)(B), and (c)(1); *see also Cowart,* 711 N.E.2d at 528 n. 2. Because 11 U.S.C. sections 523(a)(15)(A) and (B) concern future contingencies and 11 U.S.C. section 523(c)(1) requires the creditor spouse to file a petition with the bankruptcy court before triggering 11 U.S.C. section 523(a)(15), the issue of whether various non-support provisions of a divorce decree are dischargeable pursuant to 11 U.S.C. section 523(a)(15) may only properly be answered after a bankruptcy petition is filed.

### C. Remedy

■ Jack claims that the trial court's error in characterizing his $70,000.00 debt as non-dischargeable requires the reversal of "the dissolution decree" and the trial court's division of the marital property. Br. of Appellant at 22. Jack offers no support for this position, and it is far from obvious how such an error affects the entirety of the trial court's division of property or requires the reversal of the dissolution decree. We need only vacate the trial court's order characterizing Jack's $70,000.00 payment as non-dischargeable and leave the remainder of the trial court's order intact. *See Frazier,* 737 N.E.2d at 1224.

## VI. The Division of Marital Property

The trial court issued findings of fact and conclusions of law when it divided the Thompson marital estate. Appellant's App. pp. 23–38, 61–69. When a trial court issues such findings, we apply the following standard of review:

> We first determine whether the record supports the findings and, second, whether the findings support the judgment. The judgment will only be reversed when clearly erroneous, i.e. when the judgment is unsupported by the findings of fact and the conclusions entered upon the findings. Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility.

*Wyzard v. Wyzard,* 771 N.E.2d 754, 756–57 (Ind.Ct.App.2002) (citing *Breeden v. Breeden,* 678 N.E.2d 423, 425 (Ind.Ct.App. 1997)).

■■ The division of marital property in Indiana is a two-step process. *Coffey v. Coffey,* 649 N.E.2d 1074, 1077 (Ind.Ct. App.1995). The trial court must first determine what property must be included in the marital estate. *Wyzard,* 771 N.E.2d at 757 (citing Ind.Code § 31–15–7–4(a) (1998)). Included within the marital estate is all the property acquired by the joint effort of the parties. *Id.* With certain limited exceptions, this "one-pot" theory specifically prohibits the exclusion of any asset from the scope of the trial court's power to divide and award. *Id.* (citing *Coffey,* 649 N.E.2d at 1076). Only property acquired by an individual spouse after the final separation date is excluded from the marital estate. *Coffey,* 649 N.E.2d at 1076 (citing *Ross v. Ross,* 638 N.E.2d 1301, 1303 (Ind.Ct.App.1994)).

■ After determining what constitutes marital property, the trial court must then divide the marital property under the presumption that an equal split is just and reasonable. Ind.Code § 31–15–7–5 (1998); *Coffey,* 649 N.E.2d at 1077. If the trial

court deviates from this presumption, it must state why it did so. *In re Marriage of Lang*, 668 N.E.2d 285, 290 (Ind.Ct.App. 1996). A party who challenges the trial court's division of the marital estate must overcome a strong presumption that the court considered and complied with the applicable statute. *Frazier v. Frazier*, 737 N.E.2d 1220, 1223 (Ind.Ct.App.2000).

### A. After–Acquired Debt

■ Paragraph twenty-nine of the trial court's May 1, 2003 dissolution decree states:

> Wife had to expend the sum of $3240.00 in 2001 and $6708.00 in 2002 for [medical] counseling expenses and medical costs which were unpaid by Husband in those years. Husband shall reimburse the same to Wife within ten days following the entry of this decree.

Appellant's App. p. 31. Jack asserts that this order constituted an impermissible transfer of a debt arising after the filing of the dissolution decree.[20]

■ Generally, the marital estate closes on the date the dissolution petition was filed, and debts incurred by one party after that point are not to be included in the marital estate. *In re the Marriage of Moore*, 695 N.E.2d 1004, 1009 (Ind.Ct.App. 1998); *see also Fuehrer v. Fuehrer*, 651 N.E.2d 1171, 1174 (Ind.Ct.App.1995), *trans. denied* (holding that $11,000.00 in medical bills and $3000.00 in credit card debt for the purchase of clothing and other necessaries encountered by wife after the filing of the dissolution decree should not have been included within the marital estate).

■ Dana asserts that the general rule regarding marital debt should not apply in the case at bar because the "doctrine of necessities" allows the court to hold one spouse responsible for the necessities of the other spouse. Br. of Appellee at 19 (citing *Bartrom v. Adjustment Bureau*, 618 N.E.2d 1, 3–8 (Ind.1993)). However, the inter-spousal liability arising out of the "doctrine of necessities" exists only to the extent that the debtor-spouse is not able to satisfy his or her own personal needs or obligations and only renders the non-debtor-spouse *secondarily* liable for the debt. *In re the Marriage of Moore*, 695 N.E.2d at 1009 (noting "*Bartrom* does not change the long-standing general rule that, in dissolution actions, the marital estate closes on the date the dissolution petition was filed"); *see also Fuehrer*, 651 N.E.2d at 1174 (*Bartrom* does not create a free-standing cause of action for the financially inferior spouse to compel the financially superior spouse to fulfill his or her duty of support and each spouse remains primarily liable for his or her independent debts).

Because Dana's debt arose after she filed her dissolution petition and her debt is not covered by the "doctrine of necessities," we vacate the trial court's order for Jack to pay the $3240.00 and $6708.00 in medical expenses incurred by Dana.[21]

### B. Excluded Property

Jack also contends that the trial court erroneously failed to include several items of marital property within the marital es-

---

**20.** The provision requiring Jack to provide for Dana's uninsured medical expenses during dissolution proceedings in Jack and Dana's stipulation of issues was specifically stricken from the agreement. Appellant's App. pp. 197–98. Accordingly, Jack had no contractual duty to provide for Dana's uninsured medical expenses that arose after the final separation date.

**21.** Dana also seeks improperly to inject fault into our consideration of this issue, which we refuse to do.

tate and that this failure caused the actual property distribution to vary from the trial court's decision to divide the marital estate in a seventy-percent/thirty-percent split favoring Dana.

 Indiana law provides that, when dividing property in a dissolution proceeding, the court shall include property owned by either spouse prior to the marriage, acquired by either spouse in his or her own right, or acquired by the joint efforts of the spouses. Ind.Code § 31–15–7–4. "The 'one-pot' theory of [Indiana Code section 31–15–7–4] specifically prohibits the exclusion of any asset from the scope of the trial court's power to divide and award." *Ross*, 638 N.E.2d at 1303 (quoting *In re the Marriage of Dreflak*, 181 Ind.App. 651, 393 N.E.2d 773, 773 (1979)). While the trial court may ultimately decide to award an asset solely to one spouse, it must first include the asset in its consideration of the marital estate to be divided. *Lulay v. Lulay*, 591 N.E.2d 154, 155 (Ind.Ct.App.1992). We will consider each of Jack's contentions individually.

### 1. *$3000.00 in Cash*

Jack claims that there was $3000.00 in a safe of the marital residence before the filing of the dissolution petition and that this money was taken by Dana after she filed for dissolution. Accordingly, Jack asserts that this money should either be counted against Dana's share of the marital estate or be considered marital property subject to equal division. Br. of Appellant at 24. There are several problems with Jack's claim.

First, the only evidence of the $3000.00's existence that Jack draws our attention to is his own self-serving claim that the money was once there and has now disappeared. Appellant's App. pp. 712–13. In light of Jack's lack of credibility after he

first testified that he had not received any bonuses since the date of the trial court's issuance of its preliminary support order, and then "suddenly remembered" $75,591.00 in irregular income, the trial court was well within its discretion when it disregarded Jack's self-serving and uncorroborated testimony regarding the $3000.00's existence.

Second, Jack seems to be claiming, without developing an argument or pointing us to statements in the record for support, that Dana simply converted the alleged $3000.00 to her own use. However, as discussed more thoroughly in the next subsection of this opinion, because there is no evidence that this alleged $3000.00 is still in Dana's possession and capable of being placed into the marital pot, Jack's contention may only be addressed as a dissipation of marital assets claim. Accordingly, we affirm the trial court's decision not to include the alleged $3000.00 in the marital estate.

### 2. *$7000.00 from the Parties' Joint Checking Account*

 Jack notes that Dana admitted to withdrawing $7000.00 from their joint checking account one-to-two days before filing for divorce. Br. of Appellant at 24 (citing Tr. pp. 616–17). Jack also notes that Dana placed $11,000.00 into a personal checking account just forty days after making this withdrawal. Br. of Appellant at 25; Tr. p. 618. Jack claims that Dana's admissions establish that the trial court erred when it did not include the $7000.00 at issue in the marital estate.

Dana's admissions are highly indicative of improper behavior. However, Jack fails to assert that the $7000.00 in question was still in Dana's possession on May 1, 2003 and capable of being divided by the trial court. Accordingly, the $7000.00 is not

subject to a claim of improper division of marital assets.

 The proper manner for Jack to have addressed the $7000.00 was to claim that Dana improperly dissipated the money. Dissipation of marital assets involves the frivolous and unjustified spending of marital assets. *Goodman v. Goodman,* 754 N.E.2d 595, 598 (Ind.Ct.App.2001) (citing *In re the Marriage of Coyle,* 671 N.E.2d 938, 943 (Ind.Ct.App.1996)). The test to determine whether marital assets have been dissipated is to determine whether the assets in question were actually wasted or misused. *Id.* Factors to be considered in determining whether dissipation has occurred include:

(1) whether the expenditure benefited the marriage or *was made for a purpose entirely unrelated to the marriage;*

(2) *the timing of the transaction;*

(3) whether the expenditure was excessive or de minimis; and

(4) *whether the dissipating party intended to hide,* deplete, or divert the marital assets.

*Id.* (emphasis added) (citing *Pitman v. Pitman,* 721 N.E.2d 260, 264 (Ind.Ct.App. 1999), *trans. denied* ). Jack may very well have had a valid dissipation claim. However, Jack's claim cannot be addressed for the first time on appeal.

Because there is no evidence in the record indicating that the $7000.00 was still capable of being divided by the trial court on May 1, 2003, we affirm the trial court's

decision not to include the $7000.00 in the marital estate.[22]

### 3. *Items not Included in the Marital Estate*

Dana admitted that the following items were marital property: (1) the $6400.00 cash value of a life insurance policy on Dana's mother, (2) the $832.00 cash value of a life insurance policy on Jack's mother, (3) the $620.00 cash value of a life insurance policy on J.T., and (4) the $604.00 cash value of a life insurance policy on M.T. Appellant's App. pp. 809–10. The trial court neither included the above-listed items in its division of the marital estate nor indicated why the items were not included within the marital estate.[23] Appellant's App. pp. 33–34.

The omission of these items from the marital estate causes the actual property distribution to deviate from the trial court's decision to divide the property in a seventy-percent/thirty-percent split favoring Dana. Accordingly, we remand to the trial court and instruct it to include the above property in the marital estate and to recalculate the division of marital property in accordance with its decision to divide the property in a seventy-percent/thirty-percent split favoring Dana.

### C. *Repairs to the Marital Residence*

 Jack asserts that the trial court erred when it calculated the value of the repairs needed to be completed on the marital residence.

**22.** Jack cites *Melnik v. Melnik,* 413 N.E.2d 969, 973 (Ind.Ct.App.1980), in support of his position. Br. of Appellant at 25. In *Melnik,* this court upheld a trial court's decision to deduct a gift that wife gave to her grandchildren from the wife's share of the marital estate. *Melnik,* 413 N.E.2d at 972–73. However, *Melnik's* holding was expressly based upon this court's conclusion that the wife's

actions constituted a dissipation of the marital estate. *Id.* at 973. Jack's failure to raise alleged dissipation at trial and give Dana the opportunity to prove that the $7000.00 was used for proper purposes precludes us from raising dissipation as we did in *Melnik.*

**23.** Dana does not challenge this determination on appeal. Br. of Appellee at 20–21.

Dana testified that the marital residence was damaged due to fires set by J.T. in the basement, J.T.'s urination on furniture in acts of rebellion, damage to the walls resulting from J.T.'s behavior, and flood damage. Tr. pp. 71–89. Dana also submitted two exhibits expressing her opinion as to the demarcation of the damage to the marital residence. Appellant's App. pp. 565, 570–72.

However, aside from Dana's description of the damage and her estimate as to the cost of repairs, the repairs were never specifically discussed and no official estimate was introduced into evidence. Tr. pp. 71–89; Appellant's App. pp. 565, 570–72. Furthermore, Dana's second unsubstantiated estimate of necessary repairs was offered only five months after her initial unsubstantiated estimate, yet the second estimate was $11,000.00 higher. *Id.* Based upon this evidence, the trial court deducted $12,000.00 from the value of the marital residence for necessary repairs. Appellant's App. p. 33.

*Bass v. Bass,* 779 N.E.2d 582, 589 (Ind. Ct.App.2002), *trans. denied,* is directly on point. In *Bass,* a panel of this court stated:

> The trial court also found that an additional $8874.00 for "other necessary repairs" should be deducted from the appraised value of the house. At the hearing, [Wife] testified that after the home inspection, it was determined that other repairs to the marital residence were needed. She stated that she had an estimate of those repairs and guessed the estimate was "something like $8000.00." However, the repairs were not specifically discussed and no estimate was introduced into evidence. We agree with [Husband] that this evidence is not sufficient to support the trial court's finding that $8874.00 should be deducted from the appraised value of

the house for "necessary repairs." Therefore, the equity in the marital residence was $23,465.00, and on remand, the trial court should increase [Husband's] lien against the marital residence to the amount of $11,732.50.

*Id.*

As in *Bass,* Dana testified regarding items in need of repair, but no estimates of the needed repairs were ever introduced into evidence. Accordingly, we instruct the trial court to vacate the $12,000.00 deduction of the value of the marital residence.

### D. *Valuation of the Marital Estate*

Jack claims the trial court erred in determining the value of (1) his 401(k), (2) his RIGP employment fund, (3) Dana's SEP IRA, and (4) the marital residence and that those valuation errors materially altered the seventy percent/thirty percent split of the marital estate. Br. of Appellant at 28–31.

■ We will discuss each claim in order, mindful that a trial court has broad discretion in ascertaining the value of property in a dissolution action and has not abused its discretion if its decision is supported by sufficient evidence and the reasonable inferences following therefrom. *Sanjari v. Sanjari,* 755 N.E.2d 1186, 1191 (Ind.Ct.App.2001) (citing *Reese v. Reese,* 671 N.E.2d 187, 191 (Ind.Ct.App.1996), *trans. denied* ).

### 1. *Jack's 401(k)*

■ As a matter of law, the value of a pension for the purposes of dividing the marital estate only includes the pension benefits acquired prior to the final separation date. *Hodowal v. Hodowal,* 627 N.E.2d 869, 873 (Ind.Ct.App.1994), *trans. denied* (citing *Waggoner v. Waggoner,* 531

N.E.2d 1188, 1189–90 (Ind.Ct.App.1988)).[24] Jack contends that the trial court erred in valuing his 401(k) benefit because its valuation was not supported by the evidence and included amounts deposited by him after the final separation date.

■ The valuation of a retirement benefit, such as Jack's 401(k), is an undertaking that requires a court to determine (1) what evidence must be presented to establish the value of the benefit, (2) what date must be used to assign a dollar amount to the benefit, and (3) how much of the benefit's value was the result of contributions made after the final separation date. After making these three determinations, a court must consider them in concert with one another to arrive at the benefit amount used in the division of the marital estate.

### a. *Required Evidence*

■ A trial court abuses its discretion when there is no evidence in the record supporting its decision to assign a particular value to a marital asset. *Feitz v. Feitz,* 533 N.E.2d 1287, 1288 (Ind.Ct.App.1989) (citing *In re the Marriage of Sharp,* 427 N.E.2d 690, 695 (Ind.Ct.App.1981), *vacated on reh'g on other grounds* ).

On November 21, 2001, a Xerox informational notice valued Jack's 401(k) at $109,264.23. On February 1, 2002, Jack valued his 401(k) at $107,021.00. Appellant's App. p. 838; Appellant's App. 592. On February 28, 2002, a Xerox informational notice valued Jack's 401(k) at $112,205.60. Appellant's App. p. 579. On September 20, 2002, due to a loss of $9686.30 on the account and a $15,045.00 loan/withdrawal, Jack's 401(k) was valued

at $96,209.73.[25] Appellant's App. p. 585. On September 30, 2002, Dana estimated the value of Jack's 401(k) to be $128,000.00. Appellant's App. p. 580. Finally, on October 15, 2002, Dana estimated the value of Jack's 401(k) to be $170,000.00. Appellant's App. p. 721.

The trial court valued Jack's 401(k) at Dana's first proffered "estimate" of $128,000.00. Appellant's App. pp. 33–34. Jack claims that there is no evidence in the record to support this valuation. On appeal, Dana claims that, despite the fact that there is no evidence in the record supporting her $128,000.00 estimation, the trial court's decision was correct because the 401(k) was increasing in value and the trial court's decision to adopt her proffered amount merely accounted for that increase. Br. of Appellee at 22. However, Dana's argument is clearly ineffective, as the value of Jack's 401(k) actually *decreased* in the later part of 2002—which, no doubt, was not unusual during this turbulent period in the equities market. Appellant's App. p. 585. Accordingly, the trial court's decision to value Jack's 401(k) at $128,000.00 was not supported by the evidence.

Jack asserts that, because the trial court's valuation was not supported by the evidence, this court should impose his proffered $107,021.00 valuation of his 401(k). However, Jack's $107,021.00 valuation is no more supported by the record than Dana's proffered amount. Appellant's App. p. 383.

### b. *Date of Valuation* [26]

■ Trial courts are entrusted with the discretion to allocate the risk of a

---

24. "Final separation date" is defined as "the date of the filing of the petition for dissolution of marriage." *Wilson v. Wilson,* 732 N.E.2d 841, 846 (Ind.Ct.App.2000) (citing Ind.Code § 31–9–2–46 (1998)); *Harris v. Harris,* 690 N.E.2d 742, 745 (Ind.Ct.App.1998).

25. Neither party discusses the significance of this loan/withdrawal on appeal.

26. Jack claims that Dana stipulated that Jack's 401(k)'s valuation should be determined by its value on the date Dana filed for

change in value of a retirement benefit by choosing the date on which to value the benefit. *See Reese v. Reese*, 671 N.E.2d 187, 191 (Ind.Ct.App.1996) (citing *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996)). So long as the date assigned by the trial court is between the final separation date and the date of the final hearing and the trial court's allocation of subsequent risk—expressed by the date selected—is not clearly against the facts and circumstances before the court, we will not find an abuse of discretion.

### c. *The Post–Separation Value*

The last item that must be determined before establishing the value of Jack's 401(k) is what, if any, amount of the 401(k)'s growth that occurred between the filing of the dissolution petition and the trial court's chosen date of valuation must be included within the divisible marital property.[27]

■ The difficulty encountered with the valuation at bar is that the increase in the retirement benefit's post-filing value derives from two sources: (1) wages withheld from the beneficiary's post-filing income, and (2) the increases attributable to the interest accumulated from the benefit's value at the time of separation.[28] The former increase is the result of the beneficiary's contribution from non-marital property and may not be divided as a marital asset. *Skinner v. Skinner*, 644 N.E.2d

141, 146 (Ind.Ct.App.1994) (retirement benefits resulting from post-filing income should not be divided as marital property). The latter increase is the result of the benefit's mere existence and is divisible as marital property. *See Wilson v. Wilson*, 732 N.E.2d 841, 847 (Ind.Ct.App.2000), *trans. denied* (approving of the trial court's decision to value the marital residence after the final separation date so as to allow the residence's appreciated value to be included in the marital estate, but subtracting the amount that the husband paid on the residence's principal after the final separation date because the contribution was not made from marital property).

### d. *Method of calculation*

■ In order to give the spouse who contributes to the retirement benefit the value of the proceeds contributed after the filing of separation, but not deprive the other spouse of the interest generated from an asset that was acquired during the marriage, trial courts should:

(1) Choose a date between the final separation date and the final hearing to value the benefit, with the intention of allocating the risk of subsequent change in value of the asset. *Quillen*, 671 N.E.2d at 103;

(2) Based upon the date of valuation and evidence in the record, assign a value to the benefit. *Feitz*, 533 N.E.2d at 1288; and,

---

dissolution. However, the stipulation referred to by Jack is equivocal at best. Appellant's App. p. 688.

**27.** On appeal, Jack claims that he contributed $1250.00 monthly to his 401(k) after Dana filed her dissolution petition. Br. of Appellant at 30 (citing Tr. pp. 372–73). However, we note that there is substantial evidence in the record suggesting a different amount. *See* Jack's Proposed Dissolution Decree, Appellant's App. p. 338 ("Jack testified, and his pay stubs reflected, that he made contributions of

approximately $800.00 per month to his 401(k) account since the date of filing."); *see also* Appellant's App. p. 725 (Jack's pay record noting a $759.00 deduction for his 401(k)).

**28.** When, as here, the amount of the benefit at the time of the filing of the petition for dissolution is significant, the interest that can accrue from such an amount is far from insubstantial.

(3) Subtract any amount contributed by a spouse after the final separation date. *Skinner*, 644 N.E.2d at 146.

For all of these reasons, we vacate the trial court's decision to value Jack's 401(k) at $128,000.00 and remand to the trial court to determine the 401(k)'s value using the formula stated above. We also note the potential assistance that may be provided by the periodic Xerox International statements in the record.

### 2. *Jack's RIGP Pension Benefit*

The trial court's final dissolution decree valued Jack's RIGP employee pension benefit at $171,171.00. Appellant's App. p. 33. Jack claims that this benefit should have been valued at $155,421.00 because the increase of the benefit's value between the time of Dana's filing of the decree and the trial court's valuation date was the result of employer funding contingent upon Jack's continued employment with Xerox.

As with Jack's 401(k) account, because at least a portion of the post-dissolution appreciation of Jack's RIGP benefit was the result of Jack's employment contributions made after Dana's filing for dissolution, we must also vacate the trial court's $171,171.00 valuation of Jack's RIGP employee pension and remand to the trial court to assign a value to this amount by subtracting the contributions derived from Jack's continued employment from $171,171.00. *See Skinner*, 644 N.E.2d at 146.

### 3. *The Valuation of Dana's SEP IRA*

Dana admitted that the value of her SEP IRA account was $126,120.38 as of November 30, 2001. Appellant's App. p. 809. However, without giving an explanation for the decrease in value, Dana requested the trial court to value this account at $113,733.00, and the trial court complied. Appellant's App. pp. 33, 352.

An admission made pursuant to a Trial Rule 36 request for admission is conclusively established unless the court, on motion, permits withdrawal of the admission. Trial Rule 36(B); *see also Kerkhof v. Kerkhof*, 703 N.E.2d 1108, 1111 (Ind.Ct.App. 1998) (noting that a trial court may not disregard an admission) (citing *Corby v. Swank*, 670 N.E.2d 1322, 1324 (Ind.Ct. App.1996)). Because Dana admitted the amount of her SEP IRA account to be $126,120.38 and there is no evidence in the record supporting Dana's subsequent claim of a reduction in the SEP IRA's value, we vacate the trial court's $113,733.00 valuation and instruct the trial court to value the account at $126,120.38 on remand.

### 4. *Valuation of the Marital Residence*

Dana's June 23, 1999 home appraisal valued the Thompson marital residence at $387,000.00. Appellant's App. p. 525. Jack's expert witness appraised the value of the Thompson marital residence at $425,000.00 as of January 7, 2002. Tr. p. 10. The trial court accepted Dana's valuation. Appellant's App. p. 33.

Jack asserts that this court should vacate the trial court's valuation and value the marital residence at $425,000.00 because the trial court impermissibly chose a date to value the residence that was not between the final separation date and the issuance of the dissolution decree.

A trial court must chose a date between the final separation date and the final hearing for the purpose of valuing a marital asset. *Bertholet v. Bertholet*, 725 N.E.2d 487, 497 (Ind.Ct.App.2000). However, the trial court's decision to value the Thompson marital residence at $387,000.00 was not necessarily an indication that it chose a date prior to final separation to value the residence. Jack's proffered $425,000.00 valuation was heavily contest-

ed at trial, and inferences from the evidence adduced at trial supports the trial court's chosen valuation. Tr. pp. 11–36; *see also Wilson,* 732 N.E.2d at 844 (the presumption that the trial court made all the proper considerations in crafting its property distribution is one of the strongest presumptions applicable to our consideration on appeal). Because there is evidence supporting the trial court's decision, we defer to its judgment and affirm its $387,000.00 valuation of the marital residence.

### E. *Marital Debt*

The trial court's property distribution did not include Jack and Dana's marital debt on their (1) American Express credit card, (2) Lazarus charge account, and (3) 2001 Honda. Appellant's App. pp. 31–36. Jack claims the trial court erred when it failed to give him credit for payments he made on these accounts after the final separation date. Br. of Appellant at 31; Reply Br. of Appellant at 15 (citing *Salas v. Salas,* 447 N.E.2d 1176, 1180 (Ind.Ct. App.1983)).

We first note that Jack neglects to include his claim for the debt arising from the 2001 Honda in his Appellant's Brief and raises this argument for the first time in his Reply Brief. *Id.* Jack's failure to raise this issue in his Appellant's Brief and give Dana an opportunity to respond to his argument waives the issue for purposes of appellate review. Ind. Appellate Rule 46(C) (no new issues shall be raised in the reply brief); *Ward v. State,* 567 N.E.2d 85, 85 (Ind.1991) (the initial brief of the appeal must set forth and present arguments applicable to each issue intended to be raised on appeal and the reply brief only enables the appellant to respond to the brief of the appellee).

We also reject Jack's argument regarding payments on marital charge cards. Jack's citation to the record directs us to a statement—made by Jack—claiming "that he agreed with Dana's testimony indicating that he paid off both credit cards." Tr. pp. 715–16. Dana's testimony corroborates Jack's statement. Tr. p. 657. Accordingly, Jack has established that he paid off "a" marital debt after the filing of the dissolution decree.

However, Jack does not direct us to, and we are not able to locate, any evidence establishing the amount of the debt Jack paid off. Jack's proposed distribution of marital assets lists the Lazarus debt at $2000.00 and the American Express Debt at $2800.00. Appellant's App. p. 838. However, this evidence is nothing more than an unsupported assertion, and Dana testified that she too paid some of the debt in question. Appellant's App. p. 657.

Because Jack has waived the issue regarding the debt attributable to the 2001 Honda and has failed to establish the amount of debt he paid on the two credit cards, we affirm the trial court's decision not to credit Jack with payment of any of these debts.

### F. *The Seventy–Percent/Thirty–Percent Split*

Jack claims the trial court committed reversible error by dividing the marital estate in a seventy-percent/thirty-percent split favoring Dana.

The equitable division of property determined to be included within the marital estate is governed by Indiana Code section 31–15–7–5.[29] This statute provides:

The trial court shall presume that an equal division of the marital property is just and reasonable. However, this presumption may be rebutted by a party

---

**29.** Ind.Code § 31–15–7–5 (1998).

who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:

(1) The contribution of each spouse to the acquisition of property, regardless of whether the contribution was income providing.

(2) The extent to which the property was acquired by each spouse:

 (A) before the marriage; or

 (B) through inheritance or gift.

(3) The economic circumstances of each spouse at the time of the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of the children.

(4) The conduct of the parties during the marriage as related to the dissipation of marital property.

(5) The earnings or earning ability of the party as related to:

 (A) a final division of property; and

 (B) a final determination of the property rights of the parties.

Ind.Code § 31–15–7–5.[30]

If the trial court finds reasons to rebut the presumption of an equal division of the marital assets, it may divide the assets unevenly provided its sets forth its reasons for doing so. *Maloblocki v. Maloblocki,* 646 N.E.2d 358, 362 (Ind.App.1995) (citing *Euler v. Euler,* 537 N.E.2d 554 (Ind.Ct. App.1989)).

**30.** We consider the trial court's evaluation of these factors pursuant to the standard of re-

### 1. *Jack's Alleged Financial Peril*

Jack contends that the trial court's unequal division of the marital estate is clear error because it places him in a financial position that makes it impossible for him to pay his required judgments within the time period provided. Jack's lone support for this argument is his claim that much of the marital property given to him is not capable of being reduced to liquid form.

Jack's argument fails for a number of reasons. First, our finding that the trial court abused its discretion in other findings and conclusions reduces the degree of disparity complained of by Jack. Second, Jack's breakdown of the property division uses loan amounts which have no support in the record, and uses amounts that he claims he has already paid. Reply Br. of Appellant at 16–17 (including the 2001 Honda loan, Lazarus debt, and American Express debt in the property breakdown); Br. of Appellant at 31 (noting he had already paid the Lazarus and American Express debts); Reply Br. of Appellant at 15–16 (noting that he had already paid the 2001 Honda loan). Third, the trial court found that Jack earned $231,041.44 in taxable income in 2002. Appellant's App. pp. 62–63. It is reasonable for both the trial court and this court on appeal to require an *accurate* breakdown of Jack's obligations, a list of his assets capable of being reduced to liquid form, and his current savings and income earning ability. Absent such a showing, Jack is not entitled to relief.

### 2. *Fault*

Fault may not be used as a basis to support an unequal division of the marital estate. *R.E.G. v. L.M.G.,* 571 N.E.2d 298, 301 (Ind.Ct.App.1991) (noting "we will not tolerate the injection of fault into mod-

view listed at the beginning of this section of the opinion.

ern dissolution proceedings"). Jack claims that the trial court's property distribution is improperly based upon fault.

The trial court's property distribution order states:

Because of Wife's responsibility to the family and household and Husband's lack of responsibility and his behavior, the court finds that Husband's behavior had caused Wife's income to be depleted over the years. The court further finds that Wife had supported the family financially with the payment of debts as evidenced by exhibits and testimony, and she also provided primary parenting responsibilities for the children. The court also finds that Wife is fifty years of age and Husband is forty-three years of age, and Husband has superior employment to that of Wife with the capacity to earn substantially greater income than Wife over time. The court finds that Wife's income was reduced because of her family responsibilities for the children and household; therefore, Wife should receive seventy percent of the total difference in the marital estate division, with Husband receiving thirty percent.

Appellant's App. pp. 34–35.

We disagree with Jack's characterization of this language as a fault-based finding. The trial court is not contending that Jack should receive less than half of the marital estate because Jack's parental deficiencies render him deserving of such a division; the trial court is awarding Dana a greater percentage of the marital estate based upon her economic condition and earning abilities. *See* Ind.Code § 31–15–7–5(3) and (5). The trial court has simply determined that, because Dana is forced to bear the brunt of parental responsibilities, her economic circumstances and earning abilities are hindered. Consequently, Dana is entitled to a greater percentage of the marital estate.

### 3. *Dana's Responsibilities*

Jack finally asserts that the trial court abused its discretion because M.T. and J.T.'s respective ages of seventeen and fifteen do not require a great deal of parental oversight and Dana has the ability to earn more than $100,000.00 per year through her position as a realtor. Br. of Appellant at 35–36.

We do not believe the fact that the parties' children are fifteen and seventeen significantly mitigates their parental duties and responsibilities. It is, of course, true that Dana will not have to provide for M.T. and J.T. for as extended of a period of time as compared to a parent providing for toddlers. However, parental duties for high school and college age children are not insubstantial, and Dana can expect to encounter these duties for some time in the future. Furthermore, this court notes both the difficulties encountered by a single parent raising two teenage children without assistance in general and Dana's specific difficulties with the parties' children in the case at bar.

Dana earned a substantial income through her capacity as a realtor during the marriage. However, the fact that Dana no longer has assistance in providing for the needs of M.T. and J.T. and the fact that Dana's parental responsibilities are exacerbated by Jack's failure to exercise his allotted parenting time are sufficient to support the trial court's determination that Dana's earning potential has been significantly diminished.[31] The decrease in Dana's yearly salary that corresponds to

---

**31.** Jack failed to exercise eighty-one days of his allotted parenting time in 2002 and fifty-four days of his allotted parenting time during the first five months of 2003. Appellant's App. p. 61.

her increase in parental responsibilities also supports the trial court's conclusion.

All of these facts and circumstances are sufficient to support the trial court's stated reason for varying from the presumption of an equal division of marital assets, and we affirm the trial court's seventy-percent/thirty-percent split of the Thompson marital estate.

## VII. Uninsured Medical Expenses

Jack asserts that Dana asked him to pay M.T. and J.T.'s uninsured medical expenses despite the fact that she failed to present any evidence indicating that she had met her six-percent obligation for those bills, failed to demonstrate that Jack's flexible benefit account had been exhausted, and admitted that she did not attempt to use the insured benefits provided by Jack. Br. of Appellant at 36–37 (citing Tr. p. 624). Jack then asserts that a party who incurs medical expenses that would have been covered by health insurance benefits but fails to submit those expenses to the requisite insurance company should be liable for the expenses. Br. of Appellant at 37 (citing *Andrews v. Andrews*, 531 N.E.2d 219, 220 (Ind.Ct.App. 1988)).

In support of his argument, Jack directs us to the trial court's March 14, 2002 order. However, the pages of this order that Jack directs us to only contain an order concerning his failure to include his bonuses in his child support payments, an order to pay Dana's attorney fees, and a contempt order. Appellant's App. pp. 268–69. On a different page of this order, the trial court orders *Dana* to pay *Jack* $1118.63. Appellant's App. p. 267. On yet a separate page of this order, the trial court *rejected* Dana's request that Jack

pay her uninsured medical expenses. Appellant's App. p. 265.

In his reply brief, Jack directs us to paragraph four of the trial court's July 11, 2003 order. However, this paragraph only discusses Jack's failure to pay for M.T. and J.T.'s *school* expenses. Appellant's App. p. 58. The trial court's May 1, 2003 dissolution decree also does not appear to contain such an order. Paragraph thirteen of this order discusses Jack's responsibility for *future* medical benefits. Appellant's App. pp. 26–27. Paragraph twenty-nine of this order provides for *Dana's* uninsured medical expenses that were already discussed and vacated in Section 6(A) of this opinion.[32] Appellant's App. p. 31. Finally, Paragraph fifteen of the trial court's July 14, 2003 Order on Motions to Correct Error addresses Jack's *future* medical obligations to M.T. and J.T. Appellant's App. p. 63.

Finding no order to affirm or vacate, we reject Jack's argument.

## VIII. Child Support Order

■ Our standard of review for child support awards is well settled. We begin with the understanding that support calculations are made utilizing the income shares model set forth in the Indiana Child Support Guidelines ("the Guidelines"). *McGill v. McGill*, 801 N.E.2d 1249, 1250–51 (Ind.Ct.App.2004) (citing *In re the Marriage of Nienaber*, 787 N.E.2d 450, 456 (Ind.Ct.App.2003)). The Guidelines apportion the cost of supporting the children between the parents according to the means of each parent. *Id.* This approach is based upon the premise that children should receive the same portion of parental income after a dissolution that they would have received if the family had remained intact. *Id.* (citing *Fields v. Fields*,

**32.** Both Jack and Dana assert that the two medical expenses discussed in this order were attributable to her and not M.T. or J.T. Br. of Appellant at 22; Br. of Appellee at 19–20.

749 N.E.2d 100, 104 (Ind.Ct.App.2001), *trans. denied* ).

▮▮▮▮▮ A calculation of child support is presumed valid. *Fields*, 749 N.E.2d at 104. We review a trial court's decision to award child support for an abuse of discretion. *Gilbert v. Gilbert*, 777 N.E.2d 785, 790 (Ind.Ct.App.2002) (citing *Thacker v. Thacker*, 710 N.E.2d 942, 944 (Ind.Ct.App. 1999)). An abuse of discretion occurs if the trial court's decision is clearly against the logic and the effect of the facts and circumstances before the court or if the court has misinterpreted the law. *State v. Willits*, 773 N.E.2d 808, 811 (Ind.2002).

### A. Dana's Income

The trial court's July 14, 2003 Order on Motions to Correct Error calculated Dana's income to be $39,589.00 for the purpose of determining child support. Jack challenges this determination claiming that (1) Dana's failure to provide the trial court with specific parts of her tax return did not provide the trial court with an adequate basis for the calculation, (2) the trial court's order was based upon fault, and (3) the record indicates that Dana was voluntarily underemployed. Br. of Appellant at 37–41, 44.

### 1. Dana's Tax Return

▮▮▮▮▮ When determining child support, a trial court is vested with discretion in considering what business deductions may be deducted from gross income. *Zakrowski v. Zakrowski*, 594 N.E.2d 821, 824 (Ind.Ct.App.1992) (citing *Cox v. Cox*, 580 N.E.2d 344, 351 (Ind.Ct.App.1991), *trans.*

*denied* ). However, with regard to business deductions, the calculation of a parent's income for support purposes is more inclusive than it is for income tax purposes. *Clark v. Madden*, 725 N.E.2d 100, 107 (Ind.Ct.App.2000) (citing *Weiss v. Frick*, 693 N.E.2d 588, 591 (Ind.Ct.App. 1998), *trans. denied* ).

> Specifically excluded from ordinary and necessary expenses for the purpose of [the Guidelines] are depreciation, investment tax credits, or any other business expense determined by the court to be inappropriate for determining weekly gross income for the purpose of calculating child support. In general, *these types of income should be carefully reviewed. In most cases, this amount will differ from a determination of business income for tax purposes.*

*In re Marriage of Haverstock*, 599 N.E.2d 617, 620 (Ind.Ct.App.1992) (emphasis added) (quoting Ind. Child Support Guideline 3(A)(2)); *see also Zakrowski*, 594 N.E.2d at 824 (explaining the reasons for the difference between deductions allowed pursuant to the Guidelines and deductions allowed pursuant to income tax calculations).[33]

When Dana petitioned the trial court to recalculate her income for the purpose of determining Jack's child support, she submitted her 2000, 2001, and 2002 tax returns. Appellant's App. pp. 388–93, 466–71. However, the various tax returns submitted by Dana were incomplete and failed to include the pages detailing her alleged business expenses/deductions. *Id.*[34]

---

**33.** We also note that the Guidelines urge judges and practitioners to be "innovative in finding ways to include income that would have benefited the family had it remained intact, but be receptive to deviations where reasons justify them." Ind. Child Support Guideline 3(A), cmt. 2(b).

**34.** The pages of the tax returns that Dana submitted specifically reference a more comprehensive breakdown of some of Dana's listed business expenses. Appellant's App. pp. 467, 469, 471. However, the pages containing the breakdowns referenced are tellingly absent from Dana's exhibits. Appellant's App. p. 467 (referencing $33,780.00 of "other

██ The Guidelines require a party to verify their claimed income with "substantial documentation." Ind. Child Support Guideline 3(B)(2). Dana's exhibit's cursory reference to $33,780.00, $25,067.00, and $20,280.00 in "other expenses" claimed as business deductions is insufficient documentation for the trial court to "carefully review" the deductions in question. *See In re the Marriage of Haverstock*, 599 N.E.2d at 620. Furthermore, the establishment of a business deduction for tax purposes may not be sufficient to establish a deduction under the guidelines. *Clark v. Madden*, 725 N.E.2d 100, 107 (Ind.Ct.App.2000). As such, the mere indication that Dana claimed a business deduction on a tax form without any type of breakdown or description of the expense does not establish the deduction for child support purposes.

Accordingly, we vacate the trial court's valuation and instruct the trial court to recalculate Dana's income consistent with the remainder of this section of the opinion.

### 2. *Fault*

 The purpose of child support is to provide for the welfare of the child and not to punish the father or mother for an alleged wrongdoing. *Smith v. Smith*, 793 N.E.2d 282, 284 (Ind.Ct.App.2003) (citing *Rohn v. Thuma*, 408 N.E.2d 578, 582 (Ind. Ct.App.1980)). Jack claims that the trial court's order is based upon fault and,

therefore, should be vacated and recalculated.

██ Jack first notes that Dana's income was reduced over the last three years as a result of Jack's alleged lack of parental responsibility and failure to exercise visitation; accordingly, the trial court's use of the last three years of Dana's employment history to calculate her income was a fault-based determination. Br. of Appellant at 39 (citing Tr. pp. 219, 990). We disagree. For the reasons previously discussed in Section VI(F)(3) of this opinion, the trial court's decision to calculate Dana's income on the basis of the last three years of her employment was not based upon Jack's alleged fault but was instead premised upon Dana's legitimate need to decrease her workload to carry out her increased parental responsibilities.[35]

Although we require the trial court to reevaluate Dana's income on the basis of Dana's failure to meet her burden of providing substantial documentation of her business deductions, the trial court was within its discretion when it determined Dana's income on the basis of her last three years of employment. Accordingly, the trial court may continue to use Dana's last three years of income for the purpose of recalculating Dana's child support obligations.

### B. *The 2001 Honda*

██ The trial court ordered Jack to provide M.T. with the 2001 Honda in his

expenses" contained on the missing page two of the tax return); Appellant's App. p. 469 (referencing $25,067.00 of "other expenses" contained on the missing page two of the tax return); Appellant's App. p. 471 (referencing $20,280 of "other expenses" contained on the missing page two of the tax return).

35. In a related argument, Jack claims that Dana was voluntarily underemployed. Child Support Guideline 3(A)(3) provides that where a parent is voluntarily unemployed or

underemployed the court shall calculate support based upon a determination of potential income. *Castaneda v. Castaneda*, 615 N.E.2d 467, 471 (Ind.Ct.App.1993) (citing *Matter of the Paternity of Buehler*, 576 N.E.2d 1354, 1355 (Ind.Ct.App.1991)). Jack's argument fails because the reduction of income as a result of a legitimate parental responsibility does not constitute voluntary underemployment.

possession or a newer or like vehicle acceptable to Dana and to be responsible for the costs associated with the vehicle's upkeep and insurance. Appellant's App. p. 31. In addition, the trial court did not apportion any of the vehicle's expenses or appear to give Jack credit for the payment of the expenses associated with the vehicle. *Id.*

Since the date of the final dissolution, M.T. has been involved in two automobile accidents; consequently, the cost of insuring M.T.'s use of the 2001 Honda has risen considerably. Tr. p. 249. Jack has repeatedly requested permission from Dana and the trial court to provide M.T. with a vehicle that is less expensive to insure. These requests have been denied on the basis that Dana is vested with the sole authority to approve an alternate vehicle and Dana insists upon the 2001 Honda. Appellant's App. p. 58.

In this single instance, we are constrained to find the trial court's decision to be against the logic and effect of the facts and circumstances before it. First, it is unsupportable to vest Dana with the sole discretion to determine the adequacy of an alternate vehicle. Secondly, the purpose of child support is to allow the child of the marriage to enjoy the same lifestyle as the child would have enjoyed had the marriage remained intact. *In re the Marriage of Hambright*, 762 N.E.2d 98, 104 (Ind.2002) (citing Ind. Child Support Guideline 1). We cannot conclude that M.T. would have been permitted to drive the same vehicle regardless of the cost of insuring it had the Thompson marriage remained intact. Accordingly, we reverse the trial court's order regarding the 2001 Honda and instruct the trial court to make a determination, in light of M.T.'s driving history, of what type of vehicle M.T. would have en-

joyed had the Thompson marriage remained intact.

### C. *Dental Coverage*

■ Jack finally claims that he should not be required to provide dental coverage for his children because there is no evidence in the record that he ever had dental insurance for them [36] and Dana failed to make a request for such coverage at trial.

A trial court's order, with regard to child support, "may also include, where appropriate, basic health and hospitalization coverage for the children." Ind.Code § 31–16–6–4 (1998). A child's dental needs are sufficiently related to their basic health needs so as to fall within Indiana Code section 31–16–6–4. Accordingly, the trial court was well within its discretion when it held that M.T. and J.T. were entitled to dental benefits.

### IX. College Tuition

■ Jack also challenges the trial court's order awarding college expenses for his children. When reviewing a challenge to an order appropriating college expenses, we apply a clearly erroneous standard. *Sebastian v. Sebastian*, 798 N.E.2d 224, 227 (Ind.Ct.App.2003) (citing *Gilbert v. Gilbert*, 777 N.E.2d 785, 790 (Ind.Ct.App.2002)). Pursuant to the clearly erroneous standard, we do not reweigh the evidence or judge witness credibility. *Hughes v. City of Gary*, 741 N.E.2d 1168, 1172 (Ind.2001). We consider only the evidence favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.*

Jack notes that, absent an agreement by the parents, a trial court abuses its discretion by entering an educational support order that contains no limits on the studies

---

36. We find it very hard to believe that a family with the resources of the Thompson family did not provide for their children's dental needs.

a child is entitled to pursue at the expense of his or her parents. Br. of Appellant at 41 (citing *Frazier v. Frazier*, 737 N.E.2d 1220, 1226 (Ind.Ct.App.2000)). Jack also notes that M.T. should be required to make contributions to the cost of her education. *Id.* (citing *Skalon v. Skalon–Gayer*, 695 N.E.2d 953, 956 (Ind.Ct.App.1997)).

■■■ However, once again, it is difficult to determine what order Jack is appealing, because the trial court did place such limitations upon its order. The trial court restricted its college expense order to four and one-half years of M.T. and J.T.'s post-high school education and required M.T. to maintain a "C" average to be eligible for parental support. Appellant's App. p. 28. The trial court also required M.T. and J.T. to apply for "any and all scholarships or grants" for which they may qualify. *Id.*

■ Jack also challenges the trial court's decision to allow the children's Merrill Lynch accounts to be turned over to the children four years after their completion of high school rather than being used to offset college expenses. Jack bases his argument, in its entirety, upon Dana's various statements indicating that the money in the accounts at issue was set aside for the children's college expenses.

In Jack's request for admissions, Dana admitted Jack's statement of "You want [M.T.] and [J.T.'s] investor accounts to be used for college expenses." Appellant's App. p. 810. Normally, Dana's admission would be conclusive. *See* Trial Rule 36(B). However, M.T. and J.T., not Dana, were the parties affected by the admission.[37] The trial court not only had the discretion but the duty to look beyond Dana to M.T. and J.T.'s interests and to attempt to pro-

vide them with the lifestyle they would have enjoyed had the Thompson marriage remained intact. Accordingly, the trial court's decision to look for evidence beyond Dana's admission was proper.

Although the testimony was not without conflict, the record supports the trial court's determination that the accounts at issue were not necessarily set aside for M.T. and J.T.'s college expenses but were intended to be a general "nest egg" for the children.

## X. Attorney Fees

Indiana Code section 31–15–10–1 provides:

> (a) The court periodically may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this article and for attorney's fees and mediation services, including amounts for legal services provided and costs incurred before the commencement of the proceedings or after the entry of judgment.
>
> (b) The court may order the amount to be paid directly to the attorney, who may enforce the order in the attorney's own name.

Indiana Code § 31–15–10–1 (1998).

■■■ We review a trial court's decision to award attorney fees in connection with a dissolution decree for an abuse of discretion. *Augspurger v. Hudson*, 802 N.E.2d 503, 512 (Ind.Ct.App.2004). When making such an award, the trial court must consider the resources of the parties, their economic conditions, the ability of the parties to engage in gainful employment, to earn adequate income, and other factors that are pertinent to the reasonableness of the award. *Hendricks v. Hendricks*, 784

---

**37.** It is worth noting that some of the money at issue came out of the children's savings and non-parental gifts to the children.

N.E.2d 1024, 1028 (Ind.Ct.App.2003) (citing *Hanson v. Spolnik*, 685 N.E.2d 71, 80 (Ind.Ct.App.1997), *trans. denied*). Consideration of these factors further the legislative purpose behind the award of attorney fees, which is to "provide access to an attorney to a party in a dissolution proceeding who would not otherwise be able to afford one." *Fobar v. Vonderahe*, 756 N.E.2d 512, 517 (Ind.Ct.App.2001), *aff'd in relevant part* 771 N.E.2d 57 (2002).

■ Misconduct that results in further litigation expenses may be properly taken into account in the trial court's decision to award attorney fees. *Hendricks*, 784 N.E.2d at 1028. The trial court need not give its reasons for its decision to award attorney fees. *Id.* at 1028–29 (citing *In re the Marriage of Pulley*, 652 N.E.2d 528, 531 (Ind.Ct.App.1995), *trans. denied* (noting that the trial court may award attorney fees based upon misconduct causing additional fees to be incurred even where the other party received the majority of the marital estate)).

In its May 1, 2003 dissolution decree, the trial court ordered (1) Jack to reimburse Dana $16,000.00 of the attorney fees that were already paid by her, (2) Jack to pay Dana's trial attorney, Richards, $24,800.00 for legal services rendered on Dana's behalf, and (3) for Dana to be solely responsible for the balance of any attorney fees owed to her attorneys. Appellant's App. p. 37. On June 23, 2003, the trial court found that Richards had incurred an additional $11,205.82 in reasonable attorney fees since October 29, 2002.[38] Appellant's App. p. 487. The trial court based this order upon its conclusion that these fees were encountered as a result of Jack's failure to comply with the court's orders and the fact that Jack's income is substantially higher than Dana's.[39] *Id.*

■ Jack first contends that the trial court's May 1, 2003 order directing him to reimburse Dana $16,000.00 for attorney fees that she had already paid was error because Dana's self-serving testimony is the only evidence that establishes this amount. Br. of Appellant at 43. However, Jack had the ability to subpoena an itemized account of Dana's attorney fees and failed to do so. Accordingly, the trial court was within its discretion when it relied upon Dana's testimony establishing this amount.

Jack next contends that the trial court should have reduced the amount of attorney fees owed by Jack because a portion of the fees were incurred as a result of Dana's use of multiple attorneys. Br. of Appellant at 43 (citing *Stutz v. Stutz*, 556 N.E.2d 1346, 1350 (Ind.Ct.App.1990)). However, in *Stutz*, the trial court properly reduced the amount of attorney fees owed to the wife because of a showing that (1) the wife's behavior of refusing to comply with discovery caused the withdrawal of her attorney and (2) the wife's "propensity for consumer goods." *Stutz*, 556 N.E.2d at 1350. Furthermore, a substantial basis

---

**38.** This award was reduced to a judgment on August 25, 2003. Appellant's App. p. 73.

**39.** Jack asserts that due to Dana's substantial award of the majority of the marital estate, substantial child support benefits, spousal maintenance, and the amount generated by her employment, she had ample funds to pay her own attorney fees; accordingly, the trial court's May 1, 2003, July 14, 2003, and August 25, 2003 awards of attorney fees should be vacated. Reply Br. of Appellant at 21–22. We first note that there does not appear to be an award of spousal maintenance in the record. *See* Appellant's App. p. 30 (the trial court noting that maintenance is not warranted under the facts and circumstances of this case). Secondly, Jack—once again—raises this argument for the first time in his Reply Brief. Accordingly, it is waived. *See* Appellate Rule 46(C).

for *Stutz's* holding was grounded in the deference given to the trial court's broad discretion in assessing attorney fees and costs of litigation. *Id.* (citing *Hawblitzel v. Hawblitzel*, 447 N.E.2d 1156, 1164 (Ind.Ct. App.1983)).

Jack's two-sentence appellate argument does not establish that Dana's consultation with multiple attorneys, by itself, was the result of culpable behavior on Dana's part, and the trial court's broad discretion in this matter is adequately supported.

Jack next asserts that the trial court's June 23, 2003 order directing Jack to pay $11,052.00 in additional attorney fees was improper because it contradicts the trial court's May 1, 2003 order directing Dana to pay the balance of any attorney fees due to her attorney that were not covered by Jack's $16,000.00 and $24,800.00 payments.

Jack admits that "[t]he additional $11,052.00 in attorney fees [was] ordered upon Dana's argument that Jack's income had increased since the final hearing and that Jack had failed to comply with the dissolution decree. Reply Br. of Appellant at 21 (citing Tr. p. 936). Accordingly, the trial court's order to pay additional fees concerned payments arising out of litigation that occurred after the time period covered by the May 1, 2003 order. Because the May 1, 2003 order only required Dana to be responsible for the balance of the attorney fees *that were due*, the trial court's June 23, 2003 order concerning attorney fees for *subsequent* litigation was not in contravention of the order. Appellant's App. p. 37.

The trial court also had the discretion to order the attorney fees in question. *See* Ind.Code § 31–15–10–1 (allowing attorney fees for proceedings occurring after the entry of judgment); *see also Hendricks*, 784 N.E.2d at 1028 (misconduct that results in additional litigation expenses may

be included in a trial court's award for attorney fees).

Jack lastly asserts that the $11,052.00 order for additional attorney fees was improper because he had no notice of the hearing that resulted in the June 23, 2003 order and could not defend against it. Reply Br. of Appellant at 21. However, this argument (1) has already been addressed and rejected for reasons adequately expressed in the first section of this opinion, and (2) is waived because Jack raises it for the first time in his Reply Brief. Reply Br. of Appellant at 21.

Under the extenuating facts and circumstances of this proceeding, the trial court's various orders directing Jack to contribute to the cost of Dana's litigation were well within its discretion.

## XI. Appellate Attorney Fees

In the conclusion of Dana's Appellee's Brief, Dana requests this court to remand the case to the trial court to determine if she is entitled to appellate attorney fees for the appeal at bar. Br. of Appellee at 32. Jack responds, without argument or citation to authority, by noting that no such request is on file with the trial court, and accordingly, this court may not remand the case to the trial court for the purpose of determining appellate fees. Reply Br. of Appellant at 23.

Indiana Code section 31–15–10–1's language indicating that attorney fees may be awarded for proceedings occurring after the entry of final judgment includes proceedings on appeal. *Beeson v. Christian*, 594 N.E.2d 441, 443 (Ind.1992). The trial court retains jurisdiction to award appellate attorney fees even after the perfection of the appeal. *Pierce v. Pierce*, 702 N.E.2d 765, 769 (Ind.Ct.App. 1998), *trans denied* (citing *Wagner v. Wagner*, 491 N.E.2d 549, 555 (Ind.Ct.App. 1986)).

Accordingly, we reject Jack's unsupported assertion, and remand this case to the trial court to determine whether Dana is entitled to reasonable appellate attorney fees.

### Conclusion

We affirm in part, reverse in part, and remand to the trial court for proceedings consistent with this opinion.[40]

SHARPNACK, J., and VAIDIK, J., concur.

40. Appellant's Motion for Oral Argument is hereby denied.