## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 17 2016, 8:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce N. Munson
Muncie, Indiana

ATTORNEY FOR APPELLEE

Linda Stemmer
Husmann & Stemmer
Union City, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

Vicky Lochtefeld,

*Appellant-Petitioner,*

v.

James Lochtefeld,

*Appellee-Respondent.*

March 17, 2016

Court of Appeals Case No.
38A04-1506-DR-726

Appeal from the Jay Superior Court

The Honorable Marianne L. Vorhees, Special Judge

Trial Court Cause No.
38D01-1304-DR-45

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, Vicky Lochtefeld (Vicky), appeals the trial court's denial of her motion to correct error in the division of the marital estate following its Decree of Dissolution of Marriage to Appellee-Respondent, James Lochtefeld (James).

We affirm in part and remand in part for further proceedings.

## ISSUE

Vicky raises one issue on appeal, which we restate as: Whether the trial court failed to identify and properly include certain marital assets in its division of the marital estate.

## FACTS AND PROCEDURAL HISTORY

James and Vicky were married on April 21, 1989. During the marriage, two children were born, both of whom are emancipated. At the time of the marriage, James was in a farming partnership with his father, in which he owned a one-half interest valued at $275,000. James also independently owned some hog barns. After they married, James and Vicky bought James' father out of the partnership and acquired additional farmland. At the beginning of the marriage through 2009, Vicky worked outside the home and her income provided for many of the family's living expenses, so that farming profits could be reinvested to expand the farming operations. In 2009, James and Vicky opened a restaurant in Portland, Indiana through a corporation of which James

and Vicky were the sole shareholders. Vicky managed the restaurant for approximately one year and then hired a business manager. Until the time of separation in 2012, Vicky also managed the financial and "regulatory issues" of the farming operation and invested physical labor in the business. (Transcript p. 66).

[5] By the time the parties separated, they had acquired 1,100 agricultural acres, and developed a swine operation and a profitable poultry business with approximately 330,000 chickens. Before the separation and at the advice of their accountant, James and Vicky formed two limited liability companies: JAL Grain, LLC (JAL Grain) took title to "most of the land," whereas JAL Poultry and Swine, LLC (JAL Poultry) took ownership of assets valued at $2,500,000. (Appellant's App. p. 17). These assets in JAL Poultry consisted of the "home place," which was the center of the farming operation and included the marital residence, two hog barns, three chicken barns, several grain bins, the machine shed where the farm equipment was stored, the farm equipment, and 109 acres of land. (Appellant's App. p. 58). James and Vicky held equal ownership interests in JAL Grain LLC, and they each had a 47% ownership interest in JAL Poultry, with the remaining 6% divided between their two children. In addition to the two LLCs, the parties amassed a significant amount of cash during their marriage.

[6] On April 16, 2013, Vicky filed a petition to dissolve the parties' marriage. The trial court entered its preliminary order on June 20, 2014, after a hearing. On August 28, 2014, James and Vicky stipulated to a partial agreement, which the

trial court later incorporated into its Decree. After the final hearing occurred on November 18, 2014, the trial court entered its Decree of Dissolution of Marriage on December 23, 2014. Recognizing that "[t]his case involves two incredibly complex businesses[,]" the trial court divided the marital estate "as close to 50-50 as possible." (Appellant's App. p. 14). In its calculations, the trial court divided the estate into two parts with "property division as of filing date; and . . . compensation for business operations from filing date through September, 2014." (Appellant's App. p. 14). The trial court placed "in the martial estate, subject to division, the cash held by JAL Poultry and James at the filing date," and the court "divide[d] the income from the LLCs from filing date to September 2014, in an equitable way." (Appellant's App. pp. 14-15). However, the trial court cautioned James and Vicky that the "bottom line will not be 50-50, because the parties have agreed the [c]ourt should not offset gifted assets, including the Tennessee property gifted to Vicky and the approximately 110 acres (total) gifted from James' parents to James." (Appellant's App. p. 15). Although the parties agreed that each should receive these gifts without offset to the other party's side, "the assets are marital assets," and as such, the trial court placed "a value on the assets, place[d] them in the marital estate, set them over to the respective [party], and divide[d] all other assets 50-50." (Appellant's App. p. 15).

[7] Both James and Vicky filed motions to correct error. On May 26, 2015, following a hearing, the trial court entered its Order on Motions to Correct

Error and All Other Pending Motions/Petitions "to conclude all issues at the trial court level.".

[8] Vicky now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[9] Vicky takes issue with the trial court's finding that it had included all the assets in the marital estate. Specifically, Vicky contends that the trial court omitted certain amounts of cash held in deposit accounts in the name of JAL Poultry or James and the value of seed and grain owned by JAL Poultry from the marital estate. In general, we review a trial court's ruling on a motion to correct error for an abuse of discretion. *Hawkins v. Cannon*, 826 N.E.2d 658, 661 (Ind. Ct. App. 2005), *trans. denied*. A trial court has discretion to grant or deny a motion to correct error and we reverse its decision only for an abuse of that discretion. *Id*. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id*.

[10] The division of marital assets lies within the sound discretion of the trial court. *Bertholet v. Bertholet*, 725 N.E.2d 487, 494 (Ind. Ct. App. 2000). Thus, we will reverse only if that discretion is abused. *Id.* "An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id*. (citing *Wells v. Collins*, 679 N.E.2d 915, 916 (Ind. Ct. App. 1997)). As a reviewing court, we may not reweigh the

evidence or assess the credibility of witnesses, and we consider only the evidence most favorable to the trial court's disposition of marital property. *Id.* In addition, the party challenging the trial court's division must overcome a strong presumption that the court complied with the statutory guidelines. *Id.*

[11] Here, the trial court made findings of fact and conclusions of law thereon pursuant to Ind. Trial Rule 52(A) in its motion to correct error. Our standard of review is therefore two-tiered. "We first determine whether the evidence supports the findings and then whether those findings support the judgment." *Bertholet*, 725 N.E.2d at 495. On review, we do not set aside the trial court's findings or judgment unless clearly erroneous. T.R. 52(A). A finding is clearly erroneous when there is no evidence or inferences reasonably drawn therefrom to support it. *Bertholet*, 725 N.E.2d at 495. The judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions entered on the findings. *Id.* In making our determination, we neither reweigh evidence nor judge witness credibility, but we will consider only the evidence and reasonable inferences therefrom which support the judgment. *Id.* We may affirm the judgment on any legal theory supported by the findings if that theory is consistent with "all of the trial court's findings of fact and the inferences reasonably drawn from the findings[,]" and if we deem such a decision prudent in light of the evidence presented at trial and the arguments briefed on appeal. *Id.*

[12] The division of marital property in Indiana is a two-step process. *Thompson v. Thompson*, 811 N.E.2d 888, 912 (Ind. Ct. App. 2004), *trans. denied.* The trial

court must first determine what property must be included in the marital estate. *Id*. Included within the estate is all the property acquired by the joint effort of the parties. *Id.* With certain limited exceptions, this "one-pot" theory specifically prohibits the exclusion of any assets from the scope of the trial court's power to divide and award. *Id*. Only property acquired by an individual spouse after the final separation date is excluded from the marital estate. *Id*.

[13] After determining what constitutes marital property, the trial court must then divide the marital property under the presumption that an equal split is just and reasonable. Ind. Code § 31-15-7-5. A party who challenges the trial court's division of the marital estate must overcome a strong presumption that the trial court considered and complied with the applicable statute. *Frazier v. Frazier*, 737 N.E.2d 1220, 1223 (Ind. Ct. App. 2000).

[14] The Indiana supreme court has made it clear that the trial court has discretion when valuing the marital assets to set any date between the date of filing the dissolution petition and the date of hearing. *Eyler v. Eyler*, 492 N.E.2d 1071, 1074 (Ind. 1986). Here, the trial court, without any objection from the parties, placed the valuation date for the division of property at the date of filing, *i.e.*, April 16, 2013, with compensation for business transactions through September 2014.

[15] Acknowledging the complexity of the marital estate, Vicky nevertheless contends that "the issue on appeal is straightforward." (Appellant's Br. p. 10).

Pointing out the omissions from the estate, she asserts that the Decree failed to address and divide the Ally Bank accounts (Ally accounts) owned by JAL Poultry and James with balances of $1,810,760.88 and $698,627.12 respectively. She alleges that the Decree also excluded non-cash assets including grain owned by JAL Poultry with a value of $770,000.00 and seed owned by JAL Poultry with a value of $150,000.00. Because these purported omissions resulted in a substantial and unsupported deviation in favor of James, Vicky maintains that the trial court's intended equal division of the marital estate became skewed to approximately 60% for James and 40% for Vicky. After Vicky initially raised her concerns through a motion to correct error, the trial court found that

> it accounted for all the parties' money is [sic] some place in the findings. The task is complicated because the cash flow in the business ebbs and flows.

(Appellant's App. p. 124).

## I. *The Ally accounts*

Contending that the trial court erred when it understated the amount of cash to be divided in the marital estate, Vicky points to the excluded accounts as the Ally account in the name of JAL Poultry ending in 8961 for an amount of $1,810,760.88 (Ally 8961) and the Ally account in the name of James ending in 8953 for an amount of $698,627.12 (Ally 8953). On the other hand, James asserts that "the accounts did not exist at the time of the filing of the petition for

dissolution" and therefore they are not part of the marital estate. (Appellee's Br. p. 11).

[17] The parties' respective arguments bring to mind the classic adage to "follow the money." Vicky insists the money is there, but has been transferred from account to account and was not included in the marital estate, while James contends that "there is no missing money." (Appellee's Br. p. 10).

A. Ally 8961

[18] With respect to the monetary division of JAL Poultry, the trial court found as follows:

26. **[JAL Poultry]**

* * *

Jan Ingle appraised the 109 acres [used by JAL] at $732,610.00. The parties agreed the [c]ourt should value the flock at $750,000.00. The parties agreed with Mr. Puckett's valuation of the buildings, grain bins, equipment, and home at $1,950,000.00. Mr. Puckett also added $2,500.00 in value for Snap On Tools, farmhand tools, generator, and miscellaneous tools.

The [c]ourt finds the assets within JAL have a $3,435,110.00 value. This value assumes James would own 100% of the LLC. He will own 94%. The sons will own 3% each, or a 6% total. James argues the [c]ourt needs to consider certain issues related to the minority interests. The [c]ourt will discuss this issue in a later paragraph.

> At the filing date, [JAL Poultry] had $497,563.00 in its bank account. The [c]ourt will also include 94% of this amount in the assets available for division.

> James shall pay and hold Vicky harmless as to the following debt related to [JAL Poultry]: BEX (to purchase semi-trailer) in the amount of $12,000.00.

(Appellant's App. pp. 16-17).

[19] Our review of petitioner's Ex. 2—"Money Transferred from [JAL Poultry] Account"—reveals that in April 2013,[1] the sum of $1,612,420 was transferred from a CAP One account into a "Pershing Fund in the LLC name." (Appellant's App. p. 31). In November of 2013, the Pershing Fund deposited $1,675,204.79 into the LLC checking account, from where $1,700.00 was transferred into Ally 8961 the following month. Six months later, on August 15, 2014, Ally 8961 had an ending balance of "1,810,760.88." (Vol. IV, Respondent's Ex. O). While James' argument that Ally 8961 was not in existence at the valuation date is technically correct, it is clear that a significant amount of funds was held in the CAP One account on April 16, 2013, which was then subsequently deposited—albeit via several transactions—into Ally 8961. Accordingly, even though Ally 8961 did not exist, the money was clearly present in April 2013 and therefore must be accounted for in the marital estate.

---

[1] Vicky does not provide us with the exact date in April.

[20] In an attempt to explain away the existence of this cash, James first asserts that the funds represent a reserve for the business to "feed and care for the flock." (Appellee's br. p. 12). Even if Ally 8961 represents this reserve fund and even though Vicky agreed with the business decision to maintain a reserve fund for JAL Poultry, the funds cannot be excluded from the "one-pot" and must be divided equally between the parties. James also refers to his need to acquire a flock of new birds in June of 2013 at a cost of approximately $1,300,000.00 because "the flock existing at the time of the filing had a disease that impacted productivity." (Appellee's Br. p. 12). Without any citation to the record, James maintains that he used the contested funds to acquire and feed the new birds. However, his argument is belied by the admitted exhibits, which clearly indicate a growth of the funds in the CAP One account, Pershing account, and ultimately Ally 8961.

[21] James also claims that Vicky agreed to a certain amount representing "her share of the farm profits for 2014," which was accepted by the trial court. (Appellant's App. p. 24). Accordingly, he claims that "no review of LLC accounts after December 21, 2013, is required or appropriate." James mischaracterizes Vicky's stipulation. The stipulation was limited to the "2014 Farming Operations" and represents her share of the farm profits for 2014. (Appellant's App. p. 24). This stipulation does not encompass Ally 8961 but rather represents the trial court's "compensation for business operations" between the valuation date and September 2014. (Appellant's App. p. 14).

Based on the evidence before us, it appears that the trial court omitted Ally 8961—or the CAP One account as it existed on the valuation date—from the marital pot and failed to equally divide it between the parties. Even if the trial court included the Ally 8961 account and the $1,800,000 reserve fund, it appears that the trial court did not divide this marital asset between the parties. Therefore, we remand to the trial court for further clarification and division of the asset, if necessary.

### B. Ally 8953

Vicky contends that "[t]he cash in James' [Ally 8953], $698,927.00 on August 29, 2014, which came from moneys earned by JAL Poultry and was transferred by him from [JAL Poultry's] account to his [own] during the pendency of the case, is not referenced or divided in the [D]ecree." (Appellant's App. p. 13).

Unlike the funds in Ally 8961 which could be traced back to predecessor accounts through the exhibits, Ally 8953 can only be traced back to June 21, 2013. A statement dated December 15, 2013 indicates that Ally 8953 was opened on June 21, 2013—after the valuation date but during the trial court's compensation for business operations which runs through September, 2014. At that time, the account had a beginning balance of $385,460.87; a deposit of $250,000.00 from James' checking account and a withdrawal of $550,000, left an ending balance of $85,595.75. Subsequent statements of May 15, 2014, June 15, 2014, July 15, 2014, and August 15, 2014, show a continuous growth in the Ally 8953 balance, up to $698,627.12.

In its Decree, the trial court found that "James' personal accounts increased by $769,021.00." (Appellant's App. p. 24). Although the trial court identified a "personal account (SNB xxx9701) with $161,021.00 in it" and an IRA in his name, these funds do not add up to the number used by the trial court for James' personal accounts. (Appellant's App. p. 18). Accordingly, without any further identification as to which "personal accounts" the trial court refers, it is unclear whether the trial court considered Ally 8953. While we are mindful that Ally 8953—like Ally 8961—was not in existence at the valuation date, the funds used to create the Ally account may be traced back to the valuation date and should be accounted for in the marital estate. We remand to the trial court for further clarification and division of the asset, if necessary.

## II. *Seed and Grain*

Lastly, Vicky contends that the trial court failed to include the value of JAL Poultry seed for an amount of $150,000.00 and the value of JAL Poultry grain for an amount of $770,000.00.

The trial court found in its Decree

### 26. **JAL Poultry**

\* \* \*

Jan Ingle appraised the 109 acres at $732,610.00. The parties agreed the [c]ourt should value the flock at $750,000.00. The parties agreed with Mr. Puckett's valuation of the buildings, grain bins, equipment, and home at $1,950,000.00. Mr. Puckett also

added $2,500.00 in value for Snap On Tools, farmhand tools, generator, and miscellaneous tools.

The [c]ourt finds the assets within JAL [Poultry] have a $3,435,110.00 value.

(Appellant's App. p. 16). The evidence before us reflects that Brad Puckett (Puckett), an auctioneer and appraiser, valued the buildings, grain bins, attached equipment and home at $1,950,000.00. Although Vicky submitted a separate appraisal for "the value of 2014 grain crops," this appraisal was not admitted.[2] (Appellant's App. p. 91). Nevertheless, there is no evidence before us indicating that Puckett's appraisal for the JAL Poultry buildings and grain bins fails to take into consideration the value of the seed and grain. Furthermore, when the trial court distributed the assets and debts between the parties, it allocated "JAL Grain stock" to James and awarded it "no separate value; see Paragraph 26 above." (Appellant's App. p. 20). Therefore, we cannot conclude that the trial court omitted the value for the seed and grain from its division of the marital estate.

## CONCLUSION

[28] Based on the foregoing, we conclude that the trial court did not omit the JAL Poultry seed and grain from its division of the marital estate. However, we

---

[2] The appraisal was conditionally admitted, but the record shows that this condition was never removed by the trial court.

hold that the trial court appears to have failed to include the Ally 8961 account and the Ally 8953 account in its "one-pot" calculation of the marital estate. Therefore, we remand to the trial court for further consideration and clarification of both accounts and further division of the marital estate, if necessary.

[29] Affirmed in part and remanded in part for further proceedings.

[30] Najam, J. and May, J. concur