## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 06 2016, 7:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael C. Keating
Keating & LaPlante, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

B. Michael Macer
Benjamin R. Aylsworth
Biesecker Dutkanych & Macer, LLC
Evansville, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

Claudette Branson,

*Appellant-Petitioner,*

v.

Malcolm D. Branson, II,

*Appellee-Respondent.*

October 6, 2016

Court of Appeals Case No. 82A01-1601-DR-122

Appeal from the Vanderburgh Superior Court

The Honorable Robert J. Tornatta, Judge

Trial Court Cause No. 82D06-1408-DR-777

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, Claudette Branson (Wife), appeals the trial court's division of the marital estate following the dissolution of her marriage to Appellee-Respondent, Malcom D. Branson II (Husband).

We affirm.

## ISSUE

Wife raises one issue on appeal, which we restate as follows: Whether the trial court abused its discretion in its division of the marital estate.

## FACTS AND PROCEDURAL HISTORY

On July 1, 1978, Husband and Wife were married. At some point, they purchased their marital home, located at 3525 Koring Road in Evansville, Vanderburgh County, Indiana. In February of 1982, Husband and Wife adopted a three-month-old girl, who passed away during her freshman year of college at age nineteen. The marriage produced no other children.

For most of their marriage, both parties were employed, and they are in agreement that both are talented and hard-working individuals. Husband has a bachelor's degree from Indiana University and a master's degree in teaching. At the time of their marriage, Husband taught high school and coached basketball. He spent the next two decades working at Hague Equipment, Marshall Glove, and Anchor Industries. Then, in 2006, Husband went to work for Old National Bank, where he earned approximately $80,000 per year.

Husband's years of employment resulted in multiple, well-funded retirement and investment accounts. Wife has a bachelor's degree from University of Southern Indiana. Right after college, Wife worked at Mead Johnson for four years before being recruited by Operation City Beautiful, a non-profit organization. After ten years, Wife obtained new employment as the executive director of St. Mary's Medical Center Foundation. During her tenure at St. Mary's, Wife's yearly earnings ranged from $5,552 up to $96,246.[1] In 1998, Wife left her job at St. Mary's in order to spend more time with the parties' daughter before she graduated high school and left home for college. In 2000, just a few months prior to their daughter's death, Wife created her own business, a public relations firm. Wife spent ten years trying to build her business, and Husband assisted with the financial aspects. However, the business was never profitable, and Wife relied on the parties' investment and mutual funds to keep it afloat.

[6] Throughout their marriage, Husband and Wife received substantial inheritances and financial gifts from members of their families. In 1994, Husband and Wife inherited approximately $166,000 from Husband's father. With this money, Husband and Wife remodeled the basement in the marital home, paid off credit cards, and paid for living expenses. Over the course of several years, Wife's mother also gifted large sums of money to Husband and Wife, which totaled

---

[1] Wife's Social Security Statement indicates that in 1996, she had Taxed Medicare Earnings of $96,246 but Taxed Social Security earnings of 62,700.

approximately $160,000. This money was used, in part, to pay off credit cards, take vacations, and for other living expenses. Despite the financial contributions from family members and their "fairly good income," there is no dispute that Husband and Wife lived above their means during the marriage. (Tr. p. 89). The parties amassed substantial credit card debt, with Wife in particular maintaining open credit accounts with at least ten department stores. As part of her employment, Wife had "to dress the part" and entertain clients and donors. (Tr. p. 134). Husband and Wife also regularly spent money on interior design/art, fine dining, attending sporting events, and involvement in civics clubs and charitable events/donations. Husband and Wife refinanced their house several times in order to pay off the credit card debt. Husband even cancelled the credit cards, but Wife reopened them and accumulated new debt. Admittedly, Wife stated that her spending was largely a result of "keeping up with the Jones[es]." (Tr. p. 134).

[7] In 2009, Husband lost his job with Old National Bank and received a $55,000 severance payment. Thereafter, Husband remained unemployed for two years. During this time, Wife wrapped up her public relations business and did not seek new employment. Notwithstanding their drastic decrease in income, Husband and Wife maintained the same lifestyle. Thus, in order to pay their bills and other living expenses, Husband withdrew large sums of money from his retirement and investment accounts. In 2011, Husband was hired as a sales representative for Evansville Baseball, LLC (*i.e.*, the Evansville Otters). Although he was promoted to vice president by his second year of employment,

it took several years before his salary was comparable to that of his former jobs. As such, Husband continued withdrawing money from his retirement accounts to cover the parties' expenses. All told, Husband withdrew more than $227,000 from retirement and investment accounts, which was used to pay marital debts and expenses.

[8] In January of 2012, Wife's mother suffered a massive stroke, and Wife became her caretaker. Wife discussed with Husband her desire to sell the marital residence so that they could both move in to her mother's three-bedroom condominium, located at 704 Bent Grass Boulevard in Elkhart. Husband had no interest in doing this. For several months, Wife went back and forth, spending several nights per week at both her mother's home and the marital home. By April of 2012, Wife had removed a number of her possessions from the marital home and moved in with her mother. On October 30, 2012, Wife filed a petition to dissolve the marriage. This petition remained pending for more than a year. During this time, Wife continued to live with and care for her mother, and the parties made ongoing efforts to reconcile. Typically, Husband spent several nights per week at the condo with Wife and her mother, and he helped care for Wife's mother. On December 30, 2013, the dissolution petition was dismissed. Although the divorce was called off, Wife did not return to the marital home as she continued to care for her mother.

[9] On August 2, 2014, Wife's mother passed away, bequeathing half of her substantial estate to Wife. Wife received a one-half interest in her mother's condo, but because Wife desired to remain in the condo, she took a lesser share

of the cash assets of the estate in order to buy out her brother's interest. Including the value of the condo (*i.e.*, $225,000), along with her share of her mother's trust account, bonds, retirement accounts, and life insurance, Wife inherited $495,265. Less than one month later, on August 29, 2014, Wife filed a petition to dissolve the parties' marriage. During the pendency of the divorce, Husband made payments on the marital debt, and on several occasions he deposited money into Wife's checking account. On September 15 and October 12, 2015, the trial court conducted the final hearing. At the hearing, Husband requested an equal division of all marital assets, including Wife's inheritance. Wife, however, desired to keep the entirety of her inheritance.

[10] On October 14, 2015, the trial court concluded the final dissolution hearing by meeting with the parties' attorneys on a few pending matters. That day, the trial court issued its Final Decree of Dissolution of Marriage, dissolving the parties' marriage. In dividing the marital estate, the trial court concluded that "[i]t should deviate slightly in favor of the Wife" based on "the economic circumstances of the parties including the fact that the Wife is three (3) years away from qualifying for Medicare and she will derive little net economic benefit from her social security because of insurance that she will have to purchase for the next three (3) years." (Appellant's App. p. 11). However, the trial court also noted that due to her inheritance,

> Wife has a paid for residence, while the Husband, at his age, still has a substantial mortgage balance and other secured liens against his residence, and the [c]ourt believes it would be manifestly unfair for the Husband to receive no benefits from the

Wife's inheritance, while leaving him with substantial debt and leaving the Wife virtually debt free.

(Appellant's App. p. 10). Accordingly, the trial court's intent in distributing the estate between the parties was to ensure that "both parties should have a paid for residence and no ongoing payments on marital indebtedness existing at the time of their separation." (Appellant's App. p. 11). Thus, the trial court awarded Husband with the marital residence, his vehicle, and various life insurance policies, retirement accounts, and investment funds—the value of which totaled $346,325. The trial court awarded Wife with her inherited condo and the rest of her inheritance funds, along with her vehicle and her retirement accounts—the total value of which was $538,865. However, the trial court also ordered Wife to pay off the entirety of the marital debt, including the mortgage on the marital residence and associated home equity loans and all of the credit cards, which totaled $149,184. Thus, Wife's net share of the estate equaled $389,681. In other words, Wife received 53% of the marital estate, and Husband received 47%.

[11] On October 22, 2015, Wife filed a Motion to Reconsider or, in the Alternative, Motion to Reopen Evidence. On November 2, 2015, Husband filed a Motion to Place Entry of Record for Hearing Held 10/14/15. On December 15, 2015, the trial court held a hearing. The trial court advised the parties "that it is uncomfortable not placing an entry of record given the amount of time that has passed since the conclusion of the final hearing." (Appellant's App. pp. 4-5). The trial court also noted its "concern[] that both parties own their respective

[residences], free and clear, and the Wife being able to afford health insurance." (Appellant's App. p. 5). The trial court set the matter for further hearing in order for Wife's counsel "to provide specifics as to why the court should not place entry of record." (Appellant's App. p. 5). The subsequent hearing was conducted on December 21, 2015, at the close of which, the trial court "place[d] Decree of Dissolution of Marriage of Record with Modifications." (Appellant's App. p. 5). The trial court noted its "extreme reluctance" to "award[] an additional share of the marital pot to the [W]ife" because her "proclivity to spend" will cause her to "be in financial distress at some point in the future" regardless of the award. (Appellant's App. p. 19). Nevertheless, the modified Decree of Dissolution, which was filed on December 29, 2015, transferred a $5,000 investment account from Husband to Wife, and ordered Husband to assume a credit card debt of $3,781. The purpose of this modification was due to the court's concern that Wife

> has legitimate health issues and being 62, is not eligible for Medicare. She is in a "Catch 22" of needing to work for income, but not being able to afford health insurance if she does. The [H]usband on the other hand is 67, and while he is employed full time, he had planned to be at least semi-retired at this stage of life.

(Appellant's App. p. 19). This shift in assets and liabilities resulted in a total award of $337,544 (46%) to Husband and $398,462 (54%) to Wife.

[12] Wife now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

On appeal, Wife challenges the trial court's division of the marital estate. The division of marital assets is a matter left to the trial court's discretion, and we will reverse only upon a showing that the trial court has abused that discretion. *O'Connell v. O'Connell*, 889 N.E.2d 1, 10 (Ind. Ct. App. 2008). We do not reweigh evidence or assess the credibility of witnesses, and we consider only the evidence most favorable to the trial court's judgment. *Id.* "A party challenging the trial court's division of marital property must overcome a strong presumption that the trial court 'considered and complied with the applicable statute, and the presumption is one of the strongest presumptions applicable to our consideration on appeal.'" *Id.*

In this case, although requested by neither party, the trial court entered specific findings of fact and conclusions thereon. "*Sua sponte* findings control only the issues they cover, and a general judgment will control as to the issues upon which there are no findings." *Estudillo v. Estudillo*, 956 N.E.2d 1084, 1089-90 (Ind. Ct. App. 2011). As to the issues upon which there are findings, our trial court engages in a two-tiered standard of review. *Id.* at 1090. We must determine whether the evidence supports the factual findings and, then, whether those findings support the trial court's conclusions. *Id.* Our court will "not set aside the [trial court's] findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). Findings and conclusions

are clearly erroneous if there are no facts or inferences in the record to support them. *Estudillo*, 956 N.E.2d at 1090. "To determine that a finding or conclusion is clearly erroneous, an appellate court's review must leave it with the firm conviction that a mistake has been made." *Id.*

## II. *The Marital Estate*

In Indiana, the division of marital property in an action for dissolution is a two-step process. *Thompson v. Thompson*, 811 N.E.2d 888, 912 (Ind. Ct. App. 2004), *trans. denied*. First, the trial court must ascertain what property is to be included in the marital estate. *Id.* The marital estate consists of property that is:

> (1) owned by either spouse before the marriage;
>
> (2) acquired by either spouse in his or her own right:
>
> > (A)    after the marriage; and
> >
> > (B)    before final separation of the parties; or
>
> (3) acquired by their joint efforts.

Ind. Code § 31-15-7-4(a). Thus, any property that is acquired by either party at any point preceding the marriage and up to the final separation date must be included in the marital pot for division. *O'Connell*, 889 N.E.2d at 11.

> This "one-pot" theory insures that all assets are subject to the trial court's power to divide and award. While the trial court may ultimately determine that a particular asset should be

awarded solely to one spouse, it must first include the asset in its consideration of the marital estate to be divided.

*Id.* (quoting *Hill v. Hill*, 863 N.E.2d 456, 460 (Ind. Ct. App. 2007)). In general, the marital estate closes on the date the dissolution petition was filed. *Thompson*, 811 N.E.2d at 913.

[16] Second, after determining what constitutes marital property, the trial court must divide the marital property under a presumption that an equal split is just and reasonable. *Id.* at 912 (citing I.C. § 31-15-7-5). The presumption for an equal division may be rebutted by a party who presents relevant evidence that such a division would not be just and reasonable. I.C. § 31-15-7-5. In determining whether to deviate from an equal division of marital property, the trial court should consider evidence of the following factors:

> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
>
> (2) The extent to which the property was acquired by each spouse:
>
> > (A)    before the marriage; or
> >
> > (B)    through inheritance or gift.
>
> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right

to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

(A)     a final division of property; and

(B)     a final determination of the property rights of the parties.

I.C. § 31-15-7-5.

### III.  *Division of the Parties' Assets*

[17]     Despite the fact that Wife was awarded 54% of the estate, which amounts to a net value of $398,462, she claims on appeal that the trial court abused its discretion by ordering her "to pay virtually all of the marital debt." (Appellant's Br. p. 8).  In so doing, the trial court essentially reduced the amount of her $495,265 inheritance by $145,403.  Wife does not dispute that her inheritance is considered marital property and is, therefore, subject to division by the trial court.  However, she insists that she is entitled to receive the full benefit of the inheritance because it was "never co-mingled or treated as a marital asset."  (Appellant's Br. p. 10).  Thus, she contends that the trial court erroneously "failed to consider the extent marital property was acquired by [Wife] by inheritance" in fashioning an equitable division of property. (Appellant's Br. p. 10).

[18] Wife posits that the present case is analogous to *Maxwell v. Maxwell*, 850 N.E.2d 969, 973-74 (Ind. Ct. App. 2006), *trans. denied*, in which our court affirmed the trial court's decision to deviate from the presumption of an equal division by awarding a husband with the entirety of his inheritance. In *Maxwell*, the husband received his inheritance after he had moved out of the marital residence, and he was in possession of the inheritance for only a few months of the parties' marriage, which had lasted more than thirty years. *Id.* at 974. Furthermore, the inheritance had not been co-mingled with any marital assets, and the Wife had "contributed nothing to its acquisition, directly or indirectly." *Id.* Therefore, this court agreed that it was appropriate for the trial court to "set side" the inheritance exclusively to the husband, making his share of the marital estate nearly 64%. *Id.* at 973-74.

[19] Relying on *Maxwell*, Wife argues that it was an abuse of discretion to require her "to pay all of the marital debt including debts secured by assets awarded to [Husband], thereby greatly diminishing [her] inheritance" for a number of reasons. (Appellant's Br. p. 11). Specifically, she points out that she moved out of the marital residence more than two years prior to receiving the inheritance and had only been in possession of the inheritance for less than a month at the time she filed to dissolve her marriage of thirty-six years. Also, she argues that she did not inherit her condominium free and clear as she had to purchase her brother's interest for $100,000, and being required to pay the marital debt will reduce the amount of liquid assets she will have as she ages. She notes that she was gainfully employed throughout most of the marriage, and at the time of the

final hearing, Husband "was in good health, and was employed earning in excess of $70,000 per year" whereas she "suffered from health issues and was unemployed with few prospects." (Appellant's Br. p. 12). Additionally, Wife argues that it was improper for the trial court to consider her proclivity to spend in light of the fact that it did not find that she dissipated marital assets. She also asserts that the marital debt she was ordered to pay "remained at the time of the final hearing only because [Husband] paid off his debts in full while only making the minimum payments on [Wife's]." (Appellant's Br. p. 12). Wife argues that the largest credit card bill—which had a balance of $10,858—arose from her public relations business, for which Husband handled the finances. Finally, Wife posits that she should not be required to pay the marital debt in order that she may appreciate the full value of her inheritance because she

> is a woman who has not worked for a number of years, who has health issues, and no good job prospects, and who will be forced to sell the condominium that she inherited (and purchased[2]) . . . so [that] her former [H]usband, who is gainfully employed at approximately $70,000 per year, can be debt free. The trial court[']s wish that each party own a residence free and clear will soon be unattainable due to the court's orders regarding division of inheritance and payment of bills.

---

[2] We are unpersuaded by Wife's contention that she "purchased" her condominium. (Appellant's Br. p. 13). Rather, in exchange for reducing her share of the cash assets of her inheritance by $100,000, Wife gained her brother's share of the condominium—a value of $112,500. Thus, Wife's overall share of her inheritance was not reduced because she had to purchase her brother's interest in the condo. Instead of inheriting additional liquid assets, Wife chose to receive unencumbered real estate.

(Appellant's Br. p. 13). We disagree.

[20] Contrary to Wife's claim, the trial court clearly took her inheritance into account in determining how to divide the marital estate, and thus Wife's argument is simply a request that we reweigh evidence, which we will not do. *See O'Connell*, 889 N.E.2d at 10. The trial court exercised its discretion to deviate from an equal division in Wife's favor in order to compensate for her medical issues, the cost of her health insurance, and her lack of gainful employment. The trial court accordingly awarded 54% of the estate to Wife, which included the entirety of her inheritance. However, the trial court determined that only a *slight* deviation was warranted and found that "it would be manifestly unfair for the Husband to receive no benefits from the Wife's inheritance." (Appellant's App. p. 10). As such, the trial court ordered Wife to pay the marital debt "in order to reflect the disparate division of the marital estate to arrive at the approximate percentages." (Appellant's App. p. 13).

[21] The remainder of the trial court's findings and the evidence support the trial court's decision to require Wife to pay the marital debt with her inheritance. In support of its award, the trial court considered "the relationship that the Husband had with the Wife's now deceased mother from whom she inherited substantial assets" as well as "the fact that some of the gifts received by the parties from the Wife's parents during the marriage were in the form of checks made out individually to the Husband." (Appellant's App. pp. 10-11). Additional evidence revealed that Husband had a close relationship with Wife's mother; he helped her manage her finances, and he even assisted with her care

following her stroke. Although Wife had moved out of the marital residence two years before her mother died, Husband often spent several nights per week at the condo with Wife and her mother. During the time that Wife was caring for her mother, she was unemployed, and Husband worked to cover the parties' bills and living expenses. Thus, unlike in *Maxwell*, it cannot be said that Husband contributed nothing, directly or indirectly, to the acquisition of the inheritance.

[22] Moreover, the trial court found that both parties admittedly "spent extravagantly to maintain a lifestyle beyond their means, but expenditures by the Wife exceeded those made by the Husband as evidenced by credit card purchases, many of which still remain unpaid." (Appellant's App. pp. 9-10). We find that it was well within the discretion of the trial court to consider Wife's disposition of marital assets (*i.e.*, her proclivity for spending) in fashioning an equitable award. *See* I.C. § 31-15-7-5(4). Also, as found by the trial court, "[t]he parties invaded approximately $227,000 of their investment and retirement accounts to survive and maintain [their] life[]styles while unemployed or underemployed." (Appellant's App. p. 10). Even after Wife filed the petition to dissolve the marriage, the evidence establishes that Husband alone made payments on the marital debt. He also paid the premiums on Wife's health insurance, and he deposited money into her checking account. We find no merit in Wife's complaint that Husband paid off the debt in his name while only making the minimum payments on the credit cards in her name. Notwithstanding the name on the particular account, Husband's

payments decreased the total amount of *marital* debt that would have been subject to division by the trial court. Finally, although Wife was unemployed at the time of the final hearing, and had been so for several years, the trial court found that she was capable of becoming "re-employed, even if at a more sedentary type job." (Appellant's App. p. 10).

[23] The trial court was under no obligation to set off the inheritance for Wife. *See Fobar v. Vonderahe*, 771 N.E.2d 57, 60 (Ind. 2002). Rather, there is a presumption that an equal division of marital assets is just and reasonable, and in this case, the trial court set forth adequate reasons for "slightly" deviating from that presumption in favor of Wife. *Thompson*, 811 N.E.2d at 912-13. (Appellant's App. p. 11). Accordingly, we find no abuse of discretion in the trial court's division of the marital estate.

## CONCLUSION

[24] Based on the foregoing, we conclude that the trial court acted within its discretion in dividing the marital estate.

[25] Affirmed.

[26] Bailey, J. and Barnes, J. concur